AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED BY _____ D.C.

OCT 1 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. 17-8424-WM |
| JOHNNY CLYDE BENJAMIN, JR., M.D | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____8/25/2016 - 10/05/2017_____ in the county of _____PALM BEACH_____ in the _____SOUTHERN_____ District of _____FLORIDA_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC Secs 841(a)(1), 841(b)(1)(C), 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance Resulting in Death; and, Attempted Possession with Intent to Distribute a Controlled Substance |
| 18 USC Sec. 2 | Aiding and Abetting |

This criminal complaint is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Michael Buemi, Special Agent, U.S. DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____10/13/2017_____

_____
*Judge's signature*

City and state: _____West Palm Beach, Florida_____    Hon. William Matthewman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT APPLICATION
Case No. 17-8424-WM

Your affiant, Special Agent Michael Buemi, first being first duly sworn, does hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA) and have been so employed since September 2012. I am currently assigned to the DEA West Palm Beach District Office (WPBDO). Since 2013, I have been assigned to investigations dealing with all aspects of importing, manufacturing, and distributing Chinese synthetic controlled substances such as cathinones, steroids, and opioids *i.e.,* various types of fentanyl analogues. I have been the affiant for, testified in grand juries, conducted undercover (UC) operations, and assisted in the federal arrest of approximately 32 domestic and international federal defendants involving the manufacturing and distribution of Chinese synthetic controlled substances. Over twelve of said arrests involved fentanyl analogues and opioids such as furanylfentanyl (FUF), acetylfentanyl (AF), fentanyl hydrochloride (HCL), fentanyl citrate, U-47700, and betahydroxythiofentanyl. Based on my training and experience, I am aware that China is the country of origin for many of the previously mentioned synthetic controlled substances and electronic mail (e-mail) is generally utilized as the primary means of communication to converse and purchase said substances.

2. I have personally executed and been the affiant for approximately five e-mail search warrants targeting approximately fifteen e-mail accounts with United States (U.S.) e-mail providers such as Google, Inc. and Microsoft, Inc. I have also assisted other agents and law

enforcement officers in the preparation and execution of numerous other e-mail search warrants in furtherance of their investigations.

3. While serving as a SA for the DEA, I have been tasked to teach other federal agents and local law enforcement tactics and techniques on how to conduct Chinese-related investigations to include, but not limited to, e-mail search warrants, controlled deliveries of Chinese manfactured synthetic controlled substances, UC operations targeting domestic and Chinese drug traffickers, preparing investigations for prosecution of controlled analogue substances such as various opioids, and investigations that involve distribution of controlled substances resulting in death.

4. I have coordinated and conducted numerous investigations that have required working with international federal and provincial investigators based in Canada and China targeting synthetic controlled substances. Specifically, I have traveled to China and investigated Chinese citizens with the assistance of China's Ministry of Public Security (MPS) targeting various illicit chemicals such as dangerous opioids originating from Chinese manufactures. During coordinations with China and conducting joint investigations, I learned many of the common practices, tactics, and techniques utilized by Chinese drug traffickers and their inner workings dealing and communicating with distributors based in the U.S and Canada.

5. This affidavit is made for the purpose of supplying probable cause for the issuance of a criminal complaint against Johnny Clyde Benjamin Jr., M.D., hereinafter referred to as DR. BENJAMIN, charging said defendant with violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C)(distribution of a controlled substance resulting in death), and 846, and Title 18, United States Code, Section 2.

6. The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, and information obtained from other law enforcement officers and witnesses. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation.

7. On September 1, 2016, Palm Beach Sheriffs Office (PBSO) responded to a call involving the death of middle aged female, MC, who detectives believed overdosed on counterfeit opioid medication. Detectives investigated the scene and maintained custody and control of evidence discovered at the overdose scene to include counterfeit oxycodone pills, which bore the letter "M" within a square stamped on one side of the pill, and the number "30" stamped above an inscribed center line in the middle of the pill on the reverse side.[1] Agents later conducted a lab analysis of said pills and learned that the pill contained Furanylfentanyl (FUF), a Schedule I analogue substance at the time.[2] During the course of the investigation, agents learned that MC received the counterfeit pills containing FUF from an individual who later

---

[1] On September 16, 2016 a subpoena request to eBay revealed that duncanfrank95@gmail.com purchased a "M30" stamp mould die for "tablet press machine," a VGR100 die for a tablet pill press, "ready mix tablet binder" for manual table press, and another order of "M30" molds for a tablet press. Shipping addresses included in this same eBay subpoena included the following: Marsha Benjamin, 1355 37th St, Ste 301, Vero Beach, FL, 32960-7320, US, 772 559 2820 (May 24, 2016) and Johnny Benjamin, 1355 37th St, Ste 301, Vero Beach, FL, 32960-7320, US, 772 559 2820 (May 27, 2016).

[2] On the basis of your affiant's training and experience, I am aware that at the time of the distribution resulting in victim Crowley's death, that FUF was classified by DEA as a "Controlled Substance Analog" of fentanyl. I am also aware that Title 21, United States Code, Section 813, provides in this regard that "[a] controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I. I am further aware that on November 29, 2016, a final order for FUF was published in the federal register designating FUF as a temporary Schedule I controlled substance in its own right, pursuant to the temporary scheduling provisions of the Controlled Substances Act.

3

cooperated with law enforcement (hereinafter referred to as CD1[3]). CD 1 acknowledged having sold the pills which resulted in MC's death to MC within Palm Beach County, and the Southern District of Florida. CD1 advised agents as to his/her source of supply for the pills he/she provided to MC which resulted in her death (as confirmed by the postmortem conducted by the Palm Beach County Medical Examiner's Office and toxicology analysis of MC's bodily fluids at the time of her death), and thereafter conducted controlled recorded calls, controlled text messages, audio recorded meetings, and provided information that later led agents to his/her source of supply for the pills provided to MC. That individual shall be referred to herein as CD2.[4] CD1 advised your affiant that it was his/her understanding CD2 obtained the pills provided to MC from a doctor with whom CD2 had a lengthy personal relationship. Specifically, during a recorded meeting that occurred on June 1, 2017, CD1 and CD2 discussed the overdose death of MC, and discussed their shared knowledge of MC's death. CD1 and CD2 also discussed purchasing pills from a DR.

---

[3] For the Court's information CD1 was at all times material hereto a convicted felon, having sustained a prior conviction for a state drug trafficking felony -- prior to, and unrelated -- to the instant investigation. Shortly after having been approached by DEA, CD1, with the assistance of counsel, elected to cooperate with the government in this case in hopes of receiving future sentencing consideration from the Court, through the provision of substantial assistance to the government locating and prosecuting the source of supply for the FUF pills. CD1 has been extensively debriefed concerning this matter. In many instances, your affiant has been able to independently corroborate the information provided by CD1, and to date has found such consistently accurate and reliable. Information provided by CD1 has been made pursuant to a Limited Use Immunity (Proffer) Agreement with the United States.

[4] Shortly after having been approached by DEA, CD2, with the assistance of counsel, elected to cooperate with the government in this case in hopes of receiving future sentencing consideration from the Court, through the provision of substantial assistance to the government locating and prosecuting the source of supply for the FUF pills. CD2 has been extensively debriefed concerning this matter. In many instances, your affiant has been able to independently corroborate the information provided by CD2, and to date has found such consistently accurate and reliable. Information provided by CD2 has been made pursuant to a Limited Use Immunity (Proffer) Agreement with the United States. Unlike CD1, CD2 has no criminal record of any felony convictions per NCIC check.

BENJAMIN, and that CD2 was still trying to get DR. BENJAMIN to sell him/her more pills. CD2 advised CD1 that it would take time to purchase pills from DR. BENJAMIN because he/she believes that DR. BENJAMIN believed he/she (CD2) was compromised by police following the death of MC.

8. After substantial evidence was collected establishing CD2's participation in the FUF distribution, CD2 was approached by your affiant, and advised of his/her status in regards to the investigation. CD2, with the assistance of counsel, elected to cooperate with the investigation and consented to interview, pursuant to a proffer agreement letter. Thereafter, CD2 advised that that he/she personally knew, and had obtained the (FUF) pills from DR. BENJAMIN, then distributed the pills to CD1, who in turn, ultimately provided the pills to the victim MC. CD2 stated that after he/she learned of victim MC's death, he/she told DR. BENJAMIN that the aforementioned pills given to him/her (CD2) had killed someone. CD2 stated that he/she recalled that DR. BENJAMIN stated that she was just another "page in a large stack," and did not seem too concerned about the death caused by the pills. Your affiant notes that investigation determined that the DR. BENJAMIN, referenced by CD1 and CD2 is and was at all times material hereto, a licensed spinal surgeon who practices in Vero Beach, Florida, within the Southern District of Florida.

9. CD2 stated that he/she recalled that in the beginning of 2016 that DR. BENJAMIN was researching synthetic opioids on the internet in his office and expressed interest in manufacturing pills himself (DR. BENJAMIN). CD2 stated that he/she believed that DR. BENJAMIN was receiving the substances from overseas through the mail.

5

10. CD2 stated that in the approximate year of 2013, DR. BENJAMIN had him/her (CD2) purchase and receive a pill press machine on his (DR. BENJAMIN) behalf. CD2 stated that is arrived at his/her house and he/she drove it DR. BENJAMIN's office.

11. CD2 stated that he/she recalled that in the spring of 2016, CD2 was told by DR. BENJAMIN to transport unknown substances, believed by CD2 to contain urine specimens, to Selecta Laboratories for the purpose of testing the contents. CD2 stated that it was CD2's understanding that DR. BENJAMIN had synthetic opioids placed into the urine specimens so such could be verified by the laboratory analysis. CD2 provided your affiant with e-mail communications between him/herself (CD2) and DR. BENJAMIN corroborating CD2 speaking with DR. BENJAMIN about that aforementioned urines samples to be tested by Select Laboratories.

12. On July 20, 2017, federal legal process was served upon Selecta Laboratories requesting documents associated with DR. Johnny BENJAMIN and his Spine Clinic. On August 10, 2017, Selecta Laboratories provided documents in response to said subpoena which included three urinalysis lab reports for three individuals, as well as emails between DR. BENJAMIN and a Selecta laboratories representative. CD2 stated that all three patient names were made up by him/her and were names he/she made up from persons he/she knew. All three lab results appeared to have reported that the urine provided tested positive for presence of fentanyl. CD2 stated that he/she recalled asking DR. BENJAMIN what the results were and CD2 recalled that DR. BENJAMIN stating "It's what I thought it was."

13. Your affiant requested a Customs and Border Patrol (CBP) check on DR. BENJAMIN's office (1355 37th St., Suite 301, Vero Beach, FL 32960) and discovered that between April and August 2016, Marsha Benjamin, an associate of DR. BENJAMIN, is recorded

6

by CBP as being the recipient of items described as "Grinder Parts," "Mould Die 2Pcs," and "Calcium Propionate" from China. Based on my training and experience, your affiant believes that DR. BENJAMIN's office received parts and chemicals typically utilized to service a pill press machine and facilitate the manufacturing of counterfeit pills. Your affiant is also aware that Chinese chemical manufactures and exporters of illegal controlled substances typically misreport their chemicals to mislead law enforcement and increase the probability of their chemicals to pass through customs.

***E-Mail communication obtained from CD2 between CD2 and the drbenjamin@prospinecenter.com:***

14. In July 2017, your affiant received an email conversation between him/her (CD2) and drbenjamin@prospinecenter.com. The e-mail given by CD2 was dated March 18, 2016 and was sent from CD2's e-mail account to the drbenjamin@prospinecenter.com. The e-mail read "Can this info be filled in for the sample." On this same day, drbenjamin@prospinecenter.com responded with the signature block found below and attached a Zenogen [5] Health Application digital document.

> "Pro Spine Center
> Johnny. Benjamin MD
> 1355 37th St.
> Suite 301
> Vero Beach, FL 32960
> 772.978.7808
> Fax – 772.978.9320
> Drbenjamin@prospinecenter.com
> Www.prospinecenter.com
> Contact – Amanda. Mullikin, Mgr.
> Sent from my LG Optimus G Pro, an AT&T 4G LTE smartphone"

---

[5] A Zenogen application is an application provided by Selecta Laboratories for new clients. New clients provide account information, physician information, office contact information, and sales representative information.

7

*E-Mail communication between Selecta Laboratories and drbenjamin@prospinecenter.com obtained from a Grand Jury Subpoena served to Selecta Laboratories and received by agents on August 10, 2017.*

15. On Mar 23, 2016 the drbenjamin@prospinecenter.com sent an e-mail to lsanchez@selectalabs.com stating: "Lisette, Will you please email results to this address? Thank you! Johnny Benjamin MD

16. On March 23, 2016 lsanchez@selectalabs.com sent drbenjamin@prospinecenter.com the following e-mail message: "Please find patient results attached. Lisette Sanchez Selecta Laboratories P:1.888.747.7994 F: 1.800.345.0159" Attached to the aforementioned e-mail was a PDF titled "Results for Stincer, Jenna.pdf".

17. On April 14, 2016 the drbenjamin@prospinecenter.com sent an e-mail to lsanchez@selectalabs.com stating: "Haven't received anything! Johnny Benjamin MD sent from my LG Optimus G Pro, an AT&T 4G LTE smartphone"

18. On April 14, 2016 lsanchez@selectalabs.com sent drbenjamin@prospinecenter.com the following e-mail message:

"Good Afternoon Dr. Benjamin, I have faxed the toxicology results for Starnes, Jason (05/02/1981) to the fax number 772-978-9320. Results for Spivey, Melissa (11/14/1982) will follow. Should you have any questions, please do not hesitate to contact us.

Regards,
Lisette Sanchez
Selecta Laboratories
P: 1.888.747.7994
F: 1.800.345.0159"

8

19. On August 10, 2017, your affiant received the above email conversations provided by Selecta Laboratories from a subpoena signed in the Southern District of Florida. Your affiant also received copies of the lab results for Melissa Spivey, Jason Starnes, and Jenna Stincer said to have been faxed and e-mailed to DR. BENJAMIN. As previously mentioned in the case background of the investigation background, <u>all three lab results tested positive for the presence of fentanyl</u> and contained names fabricated by CD2.

***Recorded calls, text messages, meetings, and transactions between CD2 and DR. BENJAMIN:***

20. On August 16, 2016, telephone number 772-559-3833, believed to be utilized by DR. BENJAMIN text messaged CD2 asking if he/she still had electronic cigarette (e-cig) chargers that he/she received from China. CD2 and DR. BENJAMIN then negotiated on price and quantity for e-cig batteries and chargers.

21. On September 26, 2017, CD2 and DR. BENJAMIN met during the attempted sale of approximately 100 electronic cigarette (e-cig) chargers. During this meeting on September 26th, CD2 advised DR. BENJAMIN that he/she would be going to Georgia to pick up pills and weed. DR BENJAMIN expressed interest.

22. On September 27, 2017, DR. BENJAMIN instructed CD2 to communicate with him (DR. BENJAMIN) on a telephone application called WhatsApp. On this same day, CD2 and DR. BENJAMIN conducted a WhatsApp telephone call. DR. BENJAMIN utilized telephone number 772-559-3833 during this call and discussed the purchase of "trees" and "blues." CD2 understood that trees meant marijuana and blues meant oxycodone 30mg pills. CD2 and DR. BENJAMIN discussed prices for pounds of marijuana and oxycodone pills. DR. BENJAMIN advised CD2 to pick up the oxycodone if they looked right. On this same day, DR. BENJAMIN text messaged via WhatsApp that he (DR. BENJAMIN) could get rid of 40 to 50 pounds of "trees" a week.

23. On September 28, 2017, CD2 made a recorded call to 772-559-3833, utilized by DR. BENJAMIN. CD2 and DR. BENJAMIN discussed picking up oxycodone that would contain fentanyl and Benadryl (a non-controlled substance antihistamine used as a filler/binding ingredient). CD2 and DR. BENJAMIN also discussed observing the quality of "green" understood by CD2 to be marijuana. DR. BENJAMIN advised the CD2 to pick up the drugs in Atlanta and drive it North to distributors arranged by DR. BENJAMIN. DR. BENJAMIN stated that he (DR. BENJAMIN) would be up North and would receive it from CD2 when transported north.

24. On October 1, 2017, CD2 made a recorded call to 772-559-3833 utilized by DR. BENJAMIN. CD2 and DR. BENJAMIN discussed CD2 getting 2,000 oxycodone pills containing fentanyl and Benadryl fronted to him/her. DR. BENJAMIN asked the CD2 how the pills looked, and how they were by "mouth." CD2 advised DR. BENJAMIN that the pills were good by mouth. DR. BENJAMIN advised CD2 that he (DR. BENJAMIN) wanted "10 racks" at a time. CD2 advised that 10 racks are 10,000 pills. CD2 advised DR. BENJAMIN that he/she did not get sick after taking them. DR. BENJAMIN advised CD2 that if the samples go well that he (DR. BENJAMIN) could get a bunch of them gone in "New York" and "Philly" where no one could connect the dots. On this same day (October 1, 2017), DR. BENJAMIN text messaged CD2 via WhatsApp that his people wanted "5 racks to start." CD2 understood five racks to be 5,000 pills.

25. On October 4, 2017, CD2 made a recorded call to 772-559-3833 utilized by DR. BENJAMIN. CD2 and DR. BENJAMIN discussed prices for "trees" and pills coming from Georgia. CD2 stated that he/she was traveling back from Georgia to Florida with four thousand oxycodone pills. DR BENJAMIN and discussed that the price for each pill would be $4 apiece.

26. On October 5, 2017, agents conducted surveillance upon a controlled drug transaction between CD2 and DR. BENJAMIN behind the Pro Spine Center 1355 27th Street, Suite 301, Vero Beach, Florida, an area I know to be located within the Southern District of Florida. Agents provided CD2 with approximately 4,000 blue circular placebo pills containing lactose in a brown paper bag. Each pill had a stamp of "A-215"[6] stamped on one side of the pill. During the ensuing audio and video recorded meeting between CD2 and DR. BENJAMIN, CD2 provided DR. BENJAMIN with approximately 4,000 pills behind the Pro Spine building. Agents observed DR. BENJAMIN receive a brown paper bag and place it the trunk of his (DR. BENJAMIN's) 2-door black Mercedes. During the transaction, CD2 advised DR. BENJAMIN that the pills were made of Acetylfentanyl and were the closest thing to real heroin. CD2 advised DR. BENJAMIN that the strength of the pills were not "like the shit we had that I threw [CS1's first name] and the fucking girl croaked." After the transaction, CD2 and DR. BENJAMIN move into the Pro Spine Clinic and further discuss drug business. CD2 and DR. BENJAMIN discuss manufacturing their own pills utilizing pill press machines and single cranks. DR. BENJAMIN advised not to sell in his/her own area and have others pick-up the drugs. DR. BENJAMIN stated that he (DR. BENJAMIN) will hear by Saturday if the pills are good. DR. BENJAMIN advised CD2 that his associates in the Northeast, to which he would be delivering the counterfeit pills, were professionals who "got their shit so tight [that] when somebody gets jammed up, here's your attorney, go handle go and go sit-down and do you time. Go sit-down 'cause if you don't go sit-down, we'll do something to your family." DR BENJAMIN advised CD2 if people don't stay quiet after they are jammed up they will "get the other." At the conclusion of CD2 and DR.

---

[6] A blue circular A-215 pill (Oxycodone 30 mg) is identified as Oxycodone hydrochloride 30 mg and are prescribed by doctors to patients for the treatment of chronic pain. The A-215 pill is manufactured by a U.S. based company known as Actavis Pharma, Inc..

11

BENJAMIN's meeting, CD2 departed the Pro Spine Center from the rear of the building and departed the area. Within minutes after CD2's departure, surveillance observed DR. BENJAMIN enter his (DR. BENJAMIN) black 2-door Mercedes and depart the Pro Spine Center. Agents followed DR. BENJAMIN and later observed him (DR. BENJAMIN) drive behind an office building at located at 4921 US1, Vero Beach, Southern District of Florida. In front of the office building are the letters are "RPP." DR. BENJAMIN remained behind the building for approximately nine minutes. Agents then observed DR. BENJAMIN depart from the rear of the building in his black 2-door Mercedes. Agents then followed DR. BENJAMIN until he arrived back to his home located at 946 Painted Bunting Lane, Vero Beach, in the Southern District of Florida.

27. On October 5, 2017, after the drug transaction conducted behind the Pro Spine Center, CD2 conducted a recorded call to DR. BENJAMIN on WhatsApp. DR. BENJAMIN did not pick-up the call. Shortly after, that same day, DR. BENJAMIN, utilizing telephone number 772-559-3833 returned CD2's call via WhatsApp. During the telephone call, CD2 stated to DR. BENJAMIN: "Yo what's up man." DR. BENJAMIN's replied: "What's U/I." CD2 stated "Can you hear me?" DR. BENJAMIN replied: "Yeah I can hear you." CD2 stated: "Alright bet. So hey I just got a call from my buddy, my boy in Savanah and uh apparently two of his guys just ended up in the hospital because they tried to take whole ones of these off the rip. So uh just heads up when you get up there let them know to start with a half and then run the whole. You know what I mean?" DR. BENJAMIN replied: "How did they take em?" CD2 stated: "Straight to the head." DR. BENJAMIN replied: "Gotcha OK" CD2 stated: "Let them know half and go to a whole because we do not need another body falling out like that girl last year I can't deal with it. Just let them know to start with a half and go to the whole from there and it's pop. My

12

boy's buggin." DR. BENJAMIN replied: Yeah but see that's, once again, that's the whole reason running it this way." CD2 stated: "For sure, for sure but once again let them know you know what I mean, you know how they roll." DR. BENJAMIN replied: "No, no, no, believe me, believe me, believe me, I'll tell them - they will be happy to hear that actually, but I'll tell them. But I mean, that's, but once again that's the reason we're running it the way we're running it. Because at some point someone is going to have a problem, someone is going to do something stupid and when it does it needs to be so fucking far away." CD2 stated: "Yeah" DR. BENJAMIN replied: "There is no way it can ever come back."

28. On the morning of October 6, 2017, agents conducted surveillance on DR. BENJAMIN's vehicle located at the Pro Spine Clinic. At approximately 12:11 p.m., agents observed DR. BENJAMIN dressed in hospital scrubs depart Pro Spine Center and travel north in a 2015 black Mercedes bearing Florida license plate EFYI43. Agent's followed DR. BENJAMIN until parked at the Melbourne International Airport, in Melbourne, Florida. Agents discovered that DR. BENJAMIN had booked an American Airlines ticket with end destination of Philadelphia, PA. At approximately 1:00 p.m. DR. BENJAMIN arrived at the TSA checkpoint attired in a medical "scrub suit," and placed two bags on to the conveyor belt with x-ray machine. After TSA inspections, Melbourne Airport Police Department Sergeant Patrick Naughton requested consent to search DR. BENJAMIN's two bags to which DR. BENJAMIN replied "yes sir." During the search of the bags, Sergeant Naughton discovered four large unmarked pill bottles filled with blue A-215 pills. Sergeant Naughton asked who and what the pills were for and DR. BENJAMIN replied that they were for his (DR. BENJAMIN's) cancer in his neck and that he had to take 20 pills four times a day. When asked if DR. BENJAMIN had a prescription for the pills, DR. BENJAMIN replied that he did not have a prescription with him. DR.

BENJAMIN also stated that 2,000 pills were in the bottles. Sergeant Naughton advised DR. BENJAMIN that he could not fly with the pills without proper paperwork and would be holding on to them. DR. BENJAMIN then left the Airport and returned back to his office at the Pro Spine Center. DR. BENJAMIN returned to the airport police office at approximately 3:30 p.m., and provided Sergeant Naughton with a prescription signed by DR. BENJAMIN for 7,200 Fluoroucil pills that he (DR. BENJAMIN) made that same day. Sergeant Naughton advised DR. BENJAMIN that in the intervening time he (Sergeant Naughton) had done some research and that the pills were oxycodone pills, and not cancer pills, and that he would not be returning the pills to DR. BENJAMIN pending further investigation. Agents later did a field test of the pills and determined that the pills were made of lactose just as originally handed to DR. BENJAMIN from CD2 on October 5, 2017.

    29. On October 13, 2017, agents conducted a controlled recorded meeting between CD2 and DR. BENJAMIN at the Pro Spine Center. CD2 entered at the rear entrance of the Pro spine Center. The meeting lasted over one hour and agents attempted to audio record the conversation. Your affiant notes that during the meeting between CD2 and DR. BENJAMIN, one electronic recording device shut-off during the meeting. The second electronic faulted and did not record the conversation between CD2 and DR. BENJAMIN. Later, CD2 was observed by agents exiting the rear of the building and met agents at a safe location. Agents later conducted a debrief with CD2. During the debrief, CD2 stated that DR. BENJAMIN typed a statement on his (DR. BENJAMIN) computer and that police stopped him (DR. BENJAMIN) at the airport and asked if CD2 did it. CD2 stated that he/she responded by typing on the computer. CD2 stated that DR. BENJAMIN asked for his/her cellphone. CD2 responded no and that it was dead. CD2 stated that DR. BENJAMIN then snatched the cellphone from his/her hand and placed it in a jar with

peanuts in it. CD2 advised that DR. BENJAMIN stated that he (DR. BENJAMIN) was surprised that CD2 had made it to the office today because whenever there is an issue, and contemporaneously making the well-known gesture of slitting a throat. CD2 stated that DR. BENJAMIN stated that these guys don't ask questions. CD2 stated that DR. BENJAMIN advised him to not run and hide because they will just come after you, your mom, your sister, and kids. CD2 stated that DR. BENJAMIN stated that everybody is saying it was you (CD2) and that his (DR. BENJAMIN's) backstop says the source of his law enforcement problem was CD2.

30. On October 12, 2017, DR. BENJAMIN was arrested by Detectives from the Indian River County Sheriff's Department (IRCSD) on a state capias which was issued in the Circuit Court for the Nineteenth Judicial Circuit of the State of Florida for attempting to traffic Fentanyl. DR. BENJAMIN was brought back to the IRCSD where he was advised of his *Miranda* warnings. Dr. BENJAMIN waived his rights and spoke to investigators from the DEA. During the interview, DR. BENJAMIN stated the following:

  a. He was stopped by the Airport Police in Melbourne Beach, FL last week attempting to pass through TSA Security while possessing his "cancer medicine."

  b. DR. BENJAMIN stated he was asked by the Airport Police if they could look through his carry-on luggage due to a suspicious scan from the X-ray machine.

  c. DR. BENJAMIN consented to the search and the Airport Police located a ziplock baggie containing 20 yellow colored pills that DR. BENJAMIN described as his "blood pressure medicine." (was identified later as Cialis).

  d. DR. BENJAMIN said the Airport Police then recovered his "cancer medicine" which he described as four pill bottles containing yellowish/white colored pills. DR. BENJAMIN said he filled the bottles himself at his residence and then put the pills in his carry-

15

on case two days prior to his departing flight to Philadelphia. He said he took the carry-on bag from his house to his office, where the bag remained until he left for the Airport two days later. DR. BENJAMIN said he had that prescription for those pills filled some time ago because those pills were merely used only when he traveled. He said he took other cancer medicine which was at his house when he was not traveling. When asked why the pills that were recovered from his bag were blue and stamped with the logo "A215", he replied that he didn't see the pills that were recovered from his bag at the Airport; and if they were blue they weren't his because his were yellow. He was told he got a receipt for the pills that were seized and the receipt had a description. He said he didn't remember getting a copy of the receipt. DR. BENJAMIN was asked if he knew what the blue pills with the stamped logo "A215" were. He said no. He was advised that the pill is usually an OxyContin pill. DR. BENJAMIN said he didn't know what an Oxy pill looked like. Even though he said he prescribed Oxy to some patients, he didn't know what they looked like.

    e.    DR. BENJAMIN said he would get his cancer medicine (that he called Fluoroucil) in bulk powder form from an internet website and then he would have the powder pressed into pill form by Perkins Pharmacy in Vero Beach. DR. BENJAMIN said his pills were made specifically for him and were not easily attainable. He was then asked who his cancer doctor was and he said didn't see a cancer specialist for his ailment because he was a doctor and he treated himself. He was asked what kind of doctor he was in which his reply was a spine doctor. He was then asked how he was able to treated himself for cancer? He said he wrote his own prescriptions. He was asked about the prescription that he wrote for himself in the amount of 7,200 pills, and why it was written for so many when he only took these pills sparsely when he traveled. DR. BENJAMIN stated it should have said 7.2 mg. not 7,200.

16

WHEREFORE, on the basis of the foregoing facts, your affiant submits that probable cause exists to charge defendant JOHNNY CLYDE BENJAMIN, JR., M.D., with violations of Title 21, United States Code, Sections 841(a)(1)(Possession with Intent to Distribute Controlled Substances), 841(b)(1)(C)(distribution of a controlled substance resulting in death), and 846 (Conspiracy), and Title 18, United States Code, Section 2.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
MICHAEL A. BUEMI, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION


SWORN TO AND SUBSCRIBED BEFORE
ME THIS 13th DAY OF OCTOBER, 2017, AT
WEST PALM BEACH, FLORIDA.

_____
**HON. WILLIAM MATTHEWMAN**
**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PENALTY SHEET

Defendant's Name:  JOHNNY CLYDE BENJAMIN, JR., M.D

Case No.:  17-8424-WM

**Count # 1**
Conspiracy to Possess with Intent to Distribute a Controlled Substance (Resulting in Death)
Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846

Max. Penalty:   Minimum 20 years' to life term of imprisonment; maximum fine of $ 1,000,000; 3 years' to life term of supervised release: and, a $100.00 special assessment

**Count # 2**
Attempted Possession with Intent to Distribute Controlled Substances
Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846

**Max. Penalty**:   0-20 year term of imprisonment; maximum fine of $ 1,000,000; 3 years' to life term of supervised release: and, a $100.00 special assessment.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-8424-WM

**UNITED STATES OF AMERICA,**

Plaintiff,

vs.

**JOHNNY CLYDE BENJAMIN, JR., M.D,**

Defendant.

_____/

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Miami Office of the United States Attorney's Office prior to July 20, 2008?

   Yes        X **No**

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office (West Palm Beach Office) only prior to December 18, 2011?

   Yes        X **No**

3. Did this matter originate from a matter pending in the Fort Pierce Office of the United States Attorney's Office prior to August 8, 2014?

   Yes        X **No**

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

BY: _____
JOHN C. McMILLAN
ASSISTANT UNITED STATES ATTORNEY
Admin. No. A5500228
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Office:   (561) 820-8711
John.mcmillan@usdoj.gov