UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 17-80203-CR-WPD


UNITED STATES OF AMERICA,    .
                             .
            Plaintiff,       . Fort Lauderdale, Florida
                             . February 9, 2018
            v.               . 1:15 p.m.
                             .
JOHNNY CLYDE BENJAMIN, JR.,  .
                             .
            Defendant.       .
. . . . . . . . . . . . . . .


              -  -  -  -  -

        Transcript of Motion Hearing had

    before the Honorable William P. Dimitrouleas,

        United States District Judge.

              -  -  -  -  -


Proceedings recorded by mechanical stenography, transcript produced by computer.

```
APPEARANCES:

For the Government:    John C. McMillan
                       Rolando Garcia
                       Assistant U.S. Attorneys
                       United States Attorney's Office
                       500 S. Australian Avenue
                       West Palm Beach, Florida  33414

For the Defendant:     Larry D. Murrell, Jr., Esq.
                       400 Executive Center Drive
                       Suite 201
                       West Palm Beach, Florida  33401

                              and

                       Andrew B. Metcalf, Esq.
                       Green & Metcalf, P.A.
                       1245 20th Street
                       Vero Beach, FL 32960-3557

Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       299 E. Broward Blvd., Room 203
                       Fort Lauderdale, Florida 33301
                       (954)769-5657

                          -  -  -  -  -
```

1      <u>**FRIDAY, FEBRUARY 9, 2018, 1:15 P.M.**</u>

2          *(The Judge entered the courtroom)*

3      **THE COURT:**  Please be seated.

4      United States vs. Johnny Clyde Benjamin.

5          If counsel would announce their appearances for the

6  record.

7      **MR. MC MILLAN:**  Good afternoon, your Honor.  John

8  McMillan on behalf of the United States.  With me at counsel's

9  table is my co-counsel, Rolando Garcia, and also Michael Buemi,

10  that's B-U-E-M-I, of the Drug Enforcement Administration.

11     **MR. MURRELL:**  Good morning *(sic)*, Judge.  Donny

12  Murrell on behalf of the defendant, Mr. Benjamin.  And present

13  also is Andy Metcalf.  He's an attorney from Vero Beach.

14     **THE COURT:**  All right.  We're here on a motion to

15  suppress.

16         Both sides ready to proceed?

17     **MR. MC MILLAN:**  The government is, your Honor.

18     **MR. MURRELL:**  Yes, sir.

19     **THE COURT:**  All right.  The government may call its

20  first witness.

21     **MR. MC MILLAN:**  The United States calls

22  Sergeant Patrick Naughton.

23     **THE COURT REPORTER:**  Counsel, do you have a witness

24  list?

25     **MR. MC MILLAN:**  No.

1          **ROOM CLERK:**  Please raise your right hand.

2          *(PATRICK NAUGHTON, GOVERNMENT'S WITNESS, WAS SWORN)*

3          **ROOM CLERK:**  Thank you.  You may be seated.

4          Please state your name and please spell your name for

5    the record.

6          **THE WITNESS:**  Sergeant Patrick Naughton,

7    N-A-U-G-H-T-O-N.

8                        **DIRECT EXAMINATION**

9    BY MR. MC MILLAN:

10   Q.  Sergeant, how are you employed?

11   A.  I'm a sergeant at the Melbourne International Airport

12   Police Department in Melbourne, Florida.

13   Q.  What are the duties of an officer at the Melbourne

14   International Airport?

15   A.  To protect and serve the public that travel through our

16   facility.

17   Q.  Now, is there a secure area, a checkpoint at the Melbourne

18   Airport?

19   A.  Yes, there is.

20   Q.  And are part of your responsibilities -- do your

21   responsibilities and duties include assisting in searches

22   conducted at that location?

23   A.  Yes.

24   Q.  Now, directing your attention to October 6th of 2017, were

25   you on duty that day?

NAUGHTON - DIRECT/MC MILLAN

1   A.   I was.

2   Q.   And were you approached by another law enforcement agency

3   earlier that day in connection to something?

4   A.   Yes.

5   Q.   And what was the other agency that approached you?

6   A.   The DEA.

7   Q.   And was that the special agent that you see in this

8   courtroom here today?

9   A.   Yes.  Right there *(indicating)*.

10   Q.   Special Agent Michael Buemi?

11   A.   Yes.

12   Q.   And what did Special Agent Buemi ask you to do, if

13   anything?

14   A.   He explained to me that they were conducting an

15   investigation on a Dr. Benjamin that they had sold counterfeit

16   pills to, and if I could possibly get consent to search in his

17   bag to find those pills that he'd be travelling with that day.

18   Q.   Okay.  And did you ask another officer from the Melbourne

19   Airport Police Department to assist you in that duty?

20   A.   I did.

21   Q.   And what was the name of the other officer?

22   A.   Officer Austin Moyer.

23   Q.   Okay.  And was he a relatively young officer in your

24   department?

25   A.   Yes.

NAUGHTON - DIRECT/MC MILLAN

1  Q.  Okay.  What happened next?

2  A.  *(No response)*

3  Q.  Well, directing your attention to approximately one p.m.

4  that day, did you encounter anyone else in this courtroom?

5  A.  That gentleman right there *(indicating)*.

6  Q.  Can you describe what he's wearing for the record, please?

7  A.  He's a wearing a blue jumpsuit.

8          **MR. MC MILLAN:**  Your Honor, may the record reflect

9  that the witness has identified the defendant, Johnny Benjamin?

10         **THE COURT:**  The record will so reflect.

11 BY MR. MC MILLAN:

12 Q.  And where did you encounter Johnny Benjamin?

13 A.  At the checkpoint screening area.

14 Q.  Okay.  And is there -- or I should say are there signs of

15 any sort as you approach the checkpoint screening area?

16 A.  There are.

17 Q.  And what do those signs say?

18 A.  That you're subject to search when you're trying to go

19 through the checkpoint screening.  I'm not sure of the exact

20 wording.

21 Q.  Did you take photographs of those signs?

22 A.  I did.

23         **MR. MC MILLAN:**  May I approach the witness, your

24 Honor?

25         **THE COURT:**  Okay.

NAUGHTON - DIRECT/MC MILLAN

1   BY MR. MC MILLAN:

2   Q.  Sergeant Naughton, I'd like to go and show you what's been

3   marked for identification as Government's Exhibits 4 and 5.  Do

4   you recognize those two exhibits?

5          *(Government's Exhibits 4 and 5 marked for*

6   *identification)*

7   A.  I do.

8   Q.  Did you take those photographs yourself?

9   A.  Yes, sir.

10  Q.  Did they accurately depict the signs that precede entry

11  into the secure area of the airport for screening?

12  A.  Yes.

13         **MR. MC MILLAN:**  At this point, I'd move for the

14  admission of Government's Exhibits 4 and 5, your Honor.

15         **MR. MURRELL:**  No objection.

16         **THE COURT:**  Four and five will be received.

17         *(Government's Exhibits 4 and 5 admitted into evidence)*

18         **MR. MC MILLAN:**  May I publish, your Honor?

19         **THE COURT:**  Okay.

20  BY MR. MC MILLAN:

21  Q.  And, Sergeant Naughton, would you please read into the

22  record what Government's Exhibit 4 says.

23         **THE COURT:**  Why do we have to do that if it's in

24  evidence?

25         **MR. MC MILLAN:**  Very well, your Honor.

NAUGHTON - DIRECT/MC MILLAN

1   BY MR. MC MILLAN:

2   Q.   Did you see Dr. Benjamin approach the secure area of the

3   airport?

4   A.   I did.

5   Q.   Okay.  And was he carrying anything when you saw him?

6   A.   He was carrying two bags.

7   Q.   Okay.  What happened next?

8   A.   He placed the two bags on the checkpoint screening, letting

9   TSA screen the bags, and then he went through the metal

10  detector machines himself.

11  Q.   It that a metal detector or one of the body scanners?

12  A.   It's the new body scanners.

13  Q.   Okay.  And after he got out of the body scanner, where were

14  his bags?

15  A.   They had exited the x-ray machine and were sitting on the

16  end for him to pick up.

17  Q.   Okay.  Still within the secure area of the security area?

18  A.   Yes.

19  Q.   What did you do next?

20  A.   I approached Dr. Benjamin and asked him if these were his

21  bags and if I could search them.

22  Q.   Did you -- and what was his response?

23  A.   "Yes, sir."

24  Q.   And what did you do next?

25  A.   I picked up both bags, and we proceeded to take them off to


NAUGHTON - DIRECT/MC MILLAN

1    the side to do in a little private area search.

2    Q.  Now, when you say the "side," is there a screen that is at

3    the end of the body scanner device?

4    A.  After he passed through, we got his bags, they were

5    waiting, and we moved approximately ten to 15 feet over to the

6    side to get out of the public view.

7    Q.  But are you still view -- excuse me -- are you still in

8    public view, although not directly --

9    A.  Yes.

10   Q.  -- at the table that you went to?

11   A.  Yes.

12   Q.  And that was a card table about the same size as this table

13   in front of --

14   A.  Approximately, yes.

15   Q.  -- the judge's courtroom deputy?

16        **THE COURT:**  Let's just wait and not talk at the same

17   time.

18        **MR. MC MILLAN:**  Yes, your Honor.

19   BY MR. MC MILLAN:

20   Q.  Is the table about the same size as this table in front of

21   the judge's courtroom deputy?

22   A.  Yes.

23   Q.  Okay.  And were you equipped with any electronic devices

24   the day that this took place, that is, on October 6th of 2017?

25   A.  I had my own personal pen camera that I keep on duty with

NAUGHTON - DIRECT/MC MILLAN

1   me to use from time to time.

2   Q.  Okay.  And when you originally approached Johnny Benjamin,

3   did you activate that device?

4   A.  I thought I had, but it didn't go on at that time.

5   Q.  How did you know that?

6   A.  Because when we moved from the checkpoint screening at the

7   direct area of the 15 feet over, I looked down to see if it was

8   blinking, and it wasn't.  So, then I reactivated it.

9   Q.  Okay.  Was the request to search Johnny Benjamin's bag

10  captured on the audio or video recording that you made?

11  A.  No.

12  Q.  And why was that?

13  A.  I thought I had activated the camera, but it didn't

14  actually engage till after.

15  Q.  When you got to the table -- well, when was the first

16  opportunity you had to see whether or not it was actually

17  recording?

18  A.  When we got to the table, when we moved away from the

19  checkpoint's immediate area.

20  Q.  And is there some visual indicator to you on the pen

21  recorder that it is recording?

22  A.  It's a blinking light, yes.

23  Q.  Okay.  And is that a blinking light that you can see when

24  you look straight down but is not observable to the sides?

25  A.  Correct.  It's facing me.  The back of the pen faces me.

NAUGHTON - DIRECT/MC MILLAN

1   Q.  Okay.  And when was the first opportunity that you had to

2   unobtrusively look to see if it was working?

3   A.  When we moved off to the side.

4   Q.  Okay.

5          **MR. MC MILLAN:**  May I approach the witness, your

6   Honor?

7          **THE COURT:**  Okay.

8   BY MR. MC MILLAN:

9   Q.  I'm showing you what's been marked for identification as

10  Government's Exhibit 6.  Do you recognize this item?

11          *(Government's Exhibit 6 marked for identification)*

12  A.  Yes, sir.

13          **MR. MURRELL:**  Judge, we'll stipulate that's the video,

14  if he just wants to play it.  Save a little time.

15          **THE COURT:**  Okay.  Six will be received.

16          *(Government's Exhibit 6 admitted into evidence)*

17  BY MR. MC MILLAN:

18  Q.  And did you also -- were you asked to review a transcript

19  of the conversations that you had with Johnny Benjamin?

20  A.  I did.

21  Q.  Okay.  And I'm showing you what's been marked for

22  identification as Government's Exhibit 1.  Do you recognize

23  this item?

24          *(Government's Exhibit 1 marked for identification)*

25  A.  I did *(sic)*, and I initialed.

NAUGHTON - DIRECT/MC MILLAN

1   Q.  Is that a fair and accurate transcription of the

2   conversation that you had with Johnny Benjamin on October 6th

3   of 2017?

4   A.  It is.

5   Q.  Okay.  Now, you did indicate a handwritten change on

6   page 2, is that correct?

7   A.  Yes.

8   Q.  Does that bear your initials?

9   A.  It does.

10  Q.  Other than that, is it correct?

11  A.  Yes.

12  Q.  Okay.

13      **MR. MC MILLAN:**  Move for the admission of Government's

14  Exhibit 1, your Honor.

15      **MR. MURRELL:**  The transcript?

16      **MR. MC MILLAN:**  Yes.

17      **MR. MURRELL:**  No objection.

18      **THE COURT:**  One will be received.

19      *(Government's Exhibit 1 admitted into evidence)*

20      **MR. MC MILLAN:**  May I publish it to the Court, your

21  Honor?

22      **THE COURT:**  Okay.

23      **MR. MC MILLAN:**  Go ahead.

24      **THE AGENT:**  Play?

25      **MR. MC MILLAN:**  Yes.

NAUGHTON - DIRECT/MC MILLAN

1          Oh, and a copy for your Honor.

2          *(Videotape playing)*

3          **THE AGENT:**  All right.  Go ahead?

4          **MR. MC MILLAN:**  Yeah.

5          *(Videotape playing)*

6    BY MR. MC MILLAN:

7    Q.  Okay.  Sergeant Naughton, during your exchange with

8    Defendant Benjamin, can you describe what his demeanor was

9    like?  Was it friendly, hostile?  How would you describe it?

10   A.  He was cooperative and friendly, but obviously nervous.

11   Q.  Now, at some point in your exchange with him, did you

12   mention something about ammunition?

13   A.  Yes.  After I obtained consent for the search, when we were

14   taking the bags over to the table, I'm engaged in some small

15   talk about how the TSA sometimes finds things, prohibited items

16   in bags, and it could be a bullet or something that people use

17   their bags for, range bags, and then they travel with them.

18   Q.  Was that before or after you had asked Benjamin for a

19   consent?

20   A.  It was after.

21   Q.  And had he consented at that point?

22   A.  Yes.

23   Q.  Now, do you understand that people that go through the

24   checkpoint are required to be searched?

25   A.  Yes.

NAUGHTON - CROSS/MURRELL

1    Q.  Why did you ask for a consent?

2    A.  Well, the TSA process had ended with their search.  I just

3    thought it was safe for me to obtain a consent search at that

4    point.

5    Q.  Were you still in the security zone of the airport where

6    the inspections are conducted, however?

7    A.  Yes.

8    Q.  Did -- what was your understanding -- or I should say what

9    were you going to do if Benjamin had told you, "No, I don't

10   want you to search my bag"?

11   A.  I was gonna tell him he can go on now and have a good day.

12   Q.  And what would you have done in addition to that?

13   A.  I would have contacted the DEA immediately.

14   Q.  And was Special Agent Buemi waiting to hear from you as a

15   result of your exchange with Defendant Benjamin?

16   A.  Yes.

17           **MR. MC MILLAN:**  We tender the witness, your Honor.

18           **THE COURT:**  Cross-examination.

19           **MR. MURRELL:**  Thank you.

20                      **CROSS-EXAMINATION**

21   BY MR. MURRELL:

22   Q.  Sir, about what time did the DEA contact you?

23   A.  It was in the morning time, approximately nine.

24   Q.  So, it was several hours before this incident with

25   Mr. Benjamin occurred.

NAUGHTON - CROSS/MURRELL

1    A.   Yes.

2    Q.   Was the DEA present at the airport when they contacted you?

3    A.   Yes.

4    Q.   Okay.  And they spoke to you face-to-face.

5    A.   Yes.

6    Q.   Did they explain to you why they wanted you to do this,

7    other than he's under investigation?

8    A.   Yes.

9    Q.   Okay.  What was their explanation for why they wanted you

10   to conduct this search?

11   A.   They asked me if we would be assistants in gaining a

12   consent search on Dr. Benjamin's bags.

13   Q.   But as opposed to them asking for consent?  I mean, why did

14   they -- did they tell you why they wanted you to do it as

15   opposed to them seeking consent?

16   A.   I don't recall the reason.

17   Q.   All right.  Were they able to signal to you when

18   Mr. Benjamin came to the TSA checkpoint, "This is the guy we're

19   looking for"?

20   A.   Yes.

21   Q.   How did they do that?

22   A.   I believe via text.

23   Q.   All right.  So, you watched him approach the TSA

24   checkpoint, and they alerted you, "That's our man."

25   A.   They informed me he had arrived to the airport and what he

NAUGHTON - CROSS/MURRELL

1   was wearing.

2   Q.   When they were providing you with this information, did

3   they also tell you where he was going?  What flight he was

4   getting on?  What destination he had --

5   A.   I don't recall that.

6   Q.   All right.  You have provided us with pictures,

7   Government's Exhibits 4 and 5.  And they say to anybody coming

8   into that TSA area that if you're going in here, you're subject

9   to mandatory screening, correct?

10  A.   Yes.

11  Q.   And that's something that has become sort of a fact of

12  modern life for anybody flying on an airplane, right?

13  A.   Correct.

14  Q.   And you understand that.

15  A.   Yes.

16  Q.   You're there every day.

17  A.   Yes.

18  Q.   And these searches are conducted by TSA personnel, is that

19  right?

20  A.   Yes.

21  Q.   They are not conducted by you.

22  A.   After the TSA summons us, we can conduct searches.

23  Q.   Right.

24       If they summon you for assistance in a suspicious

25  package or what they believe might be a violation of law, they

NAUGHTON - CROSS/MURRELL

1  call you in, right?

2  A.  Yes.

3  Q.  Okay.  But until they call you in, you don't participate in

4  those searches, do you?

5  A.  Not normally.

6  Q.  Those are strictly TSA jobs.

7  A.  The screening of passengers, yes.

8  Q.  All right.  And what they're screening for are explosives

9  and weapons that somebody might be trying to get on to an

10  airplane with.

11  A.  Correct.

12  Q.  Now, when Mr. Benjamin put his bags on that belt, they went

13  through the x-ray machine, nobody at TSA told you that there

14  was anything suspicious in those packages, did they?

15  A.  No.

16  Q.  No one at TSA told you that when Mr. Benjamin went through

17  the scanning device that he set off any alarms, did they?

18  A.  Nope.

19  Q.  So, he cleared the TSA search, did he not?

20  A.  He did.

21  Q.  Okay.  There was no issue with TSA finding anything that

22  would have prohibited him from getting on that airplane.

23  A.  No.

24  Q.  And, in fact, as you said, I believe on direct, TSA did not

25  call you to come help them.

NAUGHTON - CROSS/MURRELL

1  A.  No.

2  Q.  All right.  Oh, I know what you said.  You said the TSA

3  process had ended, right?

4  A.  Correct.

5  Q.  Okay.  And you knew that.

6  A.  Yes.

7  Q.  But -- and if I remember from the video -- correct me if

8  I'm wrong -- his bags went through that x-ray machine, and they

9  are spit out at the other end, and you walked over there and

10  met him as he was lifting those bags up, or going to retrieve

11  his bags, is that fair?

12  A.  Yes.

13  Q.  Okay.  So, it was immediately upon completion of the TSA

14  search that you first approached him.

15  A.  Yes.

16  Q.  And did you ever inform Mr. Benjamin that the TSA search

17  was over?

18  A.  No.

19  Q.  Did you ever inform Mr. Benjamin that he had the right to

20  refuse your search?

21  A.  No.

22  Q.  And if he's operating under the belief that this search is

23  mandatory, he would let you search his bags, wouldn't he?

24  A.  I'm not sure.

25  Q.  Well, did you do anything to explain to him that the search

NAUGHTON - CROSS/MURRELL

1  that you were about to initiate was not a mandatory search?

2  A.  I asked consent, if he would mind if I looked in his bag.

3  Q.  Well, you've watched TSA do these searches thousands of

4  times, haven't you?

5  A.  Yes.

6  Q.  And when they see something suspicious, they usually say,

7  "We need to search your bag" or "May we search your bag," don't

8  they?

9  A.  Yes.

10 Q.  Okay.  It sounds like they're requesting permission, right?

11 A.  Yes.

12 Q.  But if you're gonna get on a plane, that permission is

13 taken for granted, isn't it?

14 A.  I didn't take it as he -- it was implied to me.  I was

15 asking if he minded me looking in his bag.

16 Q.  But -- all right.  Okay.

17      But you did mention something about bullets.

18 A.  Yes.

19 Q.  And you mentioned something about TSA getting all worked

20 up.

21 A.  Yes.

22 Q.  So, was that to imply to him that TSA was all worked up

23 about the results of what they saw in his baggage?

24 A.  No.

25 Q.  Why were you telling him that?

NAUGHTON - REDIRECT/MC MILLAN

1  A.  I was making small talk during our interaction.

2  Q.  But would you agree that that small talk seemed to imply

3  that TSA was asking you to do this search or participate in

4  this search?

5  A.  No, I don't feel that way.

6  Q.  Just one last question.  Was there anything to alert

7  Mr. Benjamin to the fact that the TSA search had ended?  You

8  certainly did not tell him that, did you?

9  A.  No, I did not.

10  Q.  All right.

11      **MR. MURRELL:**  I don't have any other questions of this

12  witness, Judge.

13      **THE COURT:**  Redirect?

14                  **REDIRECT EXAMINATION**

15  BY MR. MC MILLAN:

16  Q.  Now, Sergeant Naughton, are the TSA personnel sworn law

17  enforcement officers?

18  A.  No.

19  Q.  Are the TSA personnel -- do they have authority to arrest

20  anyone?

21  A.  No.

22  Q.  If there is evidence of criminal activity in the secure

23  inspection area of the airport, whose duty is it to enforce the

24  law there?

25  A.  It's the police department.

NAUGHTON - REDIRECT/MC MILLAN

1   Q.  Is that you?

2   A.  Yes, sir.

3   Q.  Uhm, and do you do that every day?

4   A.  Yes.

5   Q.  If you had seen someone in possession of what appeared to

6   you to be a hypodermic needle and heroin --

7           **MR. MURRELL:**  Judge, I object to the hypothetical.

8           **THE COURT:**  Overrule.

9   BY MR. MC MILLAN:

10  Q.  -- as they were approaching the secure area of the airport,

11  and they stuck it in their bag, could you -- once they hit the

12  inspection area, could you ask -- could you conduct a search on

13  their bag?

14  A.  A consent search?

15  Q.  Actually, a search in the secure area when they presented

16  themselves for inspection.

17  A.  I'm not sure if I quite understand the question.

18          **MR. MURRELL:**  Judge, I think it's calling for a legal

19  conclusion that he's not --

20          **THE COURT:**  Sustain.

21  BY MR. MC MILLAN:

22  Q.  Now, the defendant had cleared the TSA body scanner and the

23  x-ray machine for his luggage, is that correct?

24  A.  Yes.

25  Q.  But was he still in the secure inspection zone of the

MOYER - DIRECT/MC MILLAN

1  airport when you approached him and spoke to him?

2  A.  Yes.

3  Q.  Did you ever leave the secure inspection area and go into

4  just some other general area of the concourse before the search

5  was completed?

6  A.  No.

7        MR. MC MILLAN:  No further questions, your Honor.

8        THE COURT:  Thank you, Sergeant.  You may step down.

9  You're excused.

10        THE WITNESS:  Thank you.

11        *(Witness excused)*

12        MR. MC MILLAN:  The United States calls Officer Austin

13  Moyer.

14        ROOM CLERK:  Please raise your right hand.

15        *(AUSTIN MOYER, GOVERNMENT'S WITNESS, WAS SWORN)*

16        ROOM CLERK:  Thank you.  You may be seated.

17        Please state your name and please spell your name for

18  the record.

19        THE WITNESS:  My name is Austin Moyer.  It's

20  A-U-S-T-I-N M-O-Y-E-R.

21                    **DIRECT EXAMINATION**

22  BY MR. MC MILLAN:

23  Q.  Officer Moyer, how are you employed, sir?

24  A.  I'm employed with the City of Melbourne at the Melbourne

25  Airport Police Department.

MOYER - DIRECT/MC MILLAN

1   Q.   And as of October 6th of 2017, how long had you been

2   working there?

3   A.   A couple days shy of six months.

4   Q.   Okay.  And directing your attention to around one p.m. on

5   October 6th of 2017, were you requested to go and assist

6   another ranking officer of the Melbourne Airport Police in some

7   manner?

8   A.   That is correct, yes.

9   Q.   Who was the person that you assisted?

10  A.   That be Sergeant Naughton.

11  Q.   Okay.  And what did you assist him in doing?

12  A.   Sergeant Naughton requested me to assist him with checking

13  a bag at a TSA checkpoint.

14  Q.   Okay.  And did you meet Sergeant Naughton at the TSA

15  checkpoint?

16  A.   That is correct.

17  Q.   And at the TSA checkpoint, did you encounter anyone else in

18  this courtroom on that date?

19  A.   Yes, I did.

20  Q.   Who is that person?

21  A.   The gentleman sitting right over here *(indicating)*.

22  Q.   And can you describe what he's wearing, please, for the

23  record?

24          **MR. MURRELL:**  Judge, we'll stipulate --

25          **MR. MC MILLAN:**  Okay.

MOYER - DIRECT/MC MILLAN

```
 1           MR. MURRELL:  -- that it was --
 2           THE COURT:  The record will so reflect.
 3   BY MR. MC MILLAN:
 4   Q.  When you -- did you know that person's name?
 5   A.  At that time, yes.  It was -- I was told Mr. Benjamin is
 6   who I was looking for.
 7   Q.  Okay.  And were you with Sergeant Naughton when he
 8   approached Mr. Benjamin?
 9   A.  Yes, I was.
10   Q.  And what, if anything, did you hear in terms of an exchange
11   between them?
12   A.  Sergeant Naughton asked Mr. Benjamin if the bag sitting on
13   the TSA checkpoint rolling area belonged to him.
14           Mr. Benjamin replied they did.
15           Sergeant Naughton asked if he could search those bags.
16           And Mr. Benjamin replied, "Yes, sir."
17   Q.  Okay.  What was Defendant Benjamin's demeanor like?
18   A.  He was calm.  He was very cooperative.  Uhm, and that's
19   about it.
20   Q.  And did you also assist Sergeant Naughton in the inspection
21   of the bag?
22   A.  I did.
23   Q.  Was the initial exchange between Sergeant Naughton and
24   Defendant Benjamin within the inspection area of the airport?
25   A.  Yes, it was.
```

MOYER - CROSS/MURRELL

1   Q.  And was the search conducted of the defendant's bag within

2   the inspection portion of the airport as well?

3   A.  Yes, it was.

4           **MR. MC MILLAN:**  No further questions, your Honor.

5           **THE COURT:**  Cross-examination.

6           **MR. MURRELL:**  Briefly.

7                           **CROSS-EXAMINATION**

8   BY MR. MURRELL:

9   Q.  Prior to Mr. Benjamin's appearance at the TSA checkpoint,

10  had you been briefed up on what was going on here?

11  A.  I had.

12  Q.  Okay.  When did you first learn about what the DEA was

13  asking you to do?

14  A.  I learned it -- 15 minutes prior to what had happened, my

15  sergeant had spoke me *(sic)* and told me what he wanted me to

16  do.

17  Q.  Sergeant Naughton?

18  A.  That is correct.

19  Q.  Okay.  He said, I've spoken to DEA, they want us to do

20  this?

21  A.  That is correct.

22  Q.  Basically what it boiled down to?

23  A.  Yes, sir.

24  Q.  All right.  And at that point in time, was Mr. Benjamin

25  already at the TSA checkpoint or not?

MOYER - CROSS/MURRELL

1    A.   When my sergeant spoke to me about the situation,

2    Mr. Benjamin was not at the TSA checkpoint at that time.

3    Q.   Okay.  And how did you become aware that he had arrived?

4    A.   My sergeant spoke to me and said, I need you meet me up at

5    the TSA checkpoint in about ten to 15 minutes, which is where I

6    went and met him.

7    Q.   Maybe I didn't -- how did you know Mr. Benjamin had

8    arrived?

9    A.   Oh, I had not.  I was told to meet him up at the TSA

10   checkpoint by my sergeant.

11   Q.   When you got there, was -- do you know if Mr. Benjamin was

12   already in line or not?

13   A.   I did see Mr. Benjamin in line when I walked through the

14   TSA checkpoint to meet my sergeant.

15   Q.   How did you know who it was?

16   A.   I was told by my sergeant that the DEA told him that we

17   were looking for a black male at a certain height with scrubs

18   on.  He was the only black male at the height, around six foot,

19   that had scrubs on in line.

20   Q.   Okay.  All right.  And you were standing with

21   Sergeant Naughton, how far away from the TSA screening belt?

22   A.   Four feet, maybe three.

23   Q.   Okay.  Let's say this table was the screening belt.

24   They're coming through this way, right?  And heading out into

25   the concourse area?

27

MOYER - CROSS/MURRELL

1   A.   Yes, sir.

2   Q.   And you were, what, four feet over --

3   A.   The line started here, if that was where the TSA -- if you

4   were the TSA officer where you were standing, and they're

5   checking through the camera, I was standing about three feet

6   from right where you would be standing at that table.

7   Q.   Okay.  So, as Mr. Benjamin comes through the line to

8   collect his belongings, you're standing right where he's

9   coming.

10  A.   That is correct.

11  Q.   He essentially walks up to you.

12  A.   That is correct.  Well, actually, I had to pass him as well

13  coming through, because I came through TSA at the front and

14  walked straight through the line and passed him at the same

15  time.

16  Q.   All right.  And as -- so, you're within probably arm's

17  reach of each other when he's going to retrieve his luggage?

18  A.   I was in arm's reach of my sergeant.  Mr. Benjamin was

19  still walking through the checkpoint as the bags came through.

20  Q.   All right.  Did you step forward towards those bags before

21  he got there or was it kind of a simultaneous thing?

22  A.   It was a simultaneous thing.

23  Q.   All right.  You both -- I'm sorry?

24  A.   No, go ahead.

25  Q.   You both arrived at his bags at about the same time?

MOYER - CROSS/MURRELL

1   A.  We were standing off to the side as Mr. Benjamin came

2   through and got to his bags.

3   Q.  All right.  Who spoke to him first?

4   A.  My sergeant, Sergeant Naughton.

5   Q.  What did he say?

6   A.  He said, "Sir, do these bags belong to you?"

7   Q.  And Mr. Benjamin acknowledged that they did.

8   A.  He said, "Yes, sir."

9   Q.  What did he say after that?

10  A.  He said, "May we search your bags?"

11  Q.  Did he explain why they needed to be searched?

12  A.  Not at that time, no, sir.

13  Q.  Well, did he tell him that TSA had thought they saw bullets

14  in the bag?

15  A.  Not at that time, no, sir.

16  Q.  When did he say that?

17  A.  That was after he asked if we may search the bags, and we

18  had consent that said "Yes, sir," during small talk on the way

19  over he mentioned that there's a possibility it could be

20  something along the lines of bullets or something that TSA

21  noticed and we just wanted to double-check.

22  Q.  Okay.  He told Mr. Benjamin that TSA thought they had seen

23  bullets, and you wanted to double-check.

24  A.  He didn't say -- he said there's possibly, it could have

25  been something along the lines of bullets *(sic)*.

MOYER - CROSS/MURRELL

1   Q.  Well, they were concerned.

2   A.  Yes.

3   Q.  He told Mr. Benjamin that TSA was concerned that there

4   might be bullets in the bag.

5   A.  That is correct.

6   Q.  Okay.  And that you were checking to confirm whether there

7   were, in fact, bullets in the bag or not.

8   A.  At that time, we were checking to see what it was that they

9   were concerned about.

10  Q.  Right.  Okay.

11          At any point during this interaction with

12  Mr. Benjamin, did you or Mr. Naughton explain to him that the

13  TSA search was over?

14  A.  No, we did not.

15  Q.  Did either one of you explain to him that what you were

16  doing had nothing to do with the TSA search?

17  A.  No, we did not.

18  Q.  Did either one of you tell him that he had the right to

19  refuse consent to search his luggage at that point?

20  A.  No, sir.

21          **MR. MURRELL:**  I don't have any other questions, Judge.

22          **THE COURT:**  Redirect?

23          **MR. MC MILLAN:**  No.  No, thank you, your Honor.

24          **THE COURT:**  Thank you, Officer.  You may step down.

25  You're excused.

CRAIG - DIRECT/MC MILLAN

1          **THE WITNESS:**  Thank you, sir.

2          *(Witness excused)*

3          **THE COURT:**  The government may call its next witness.

4          **MR. MC MILLAN:**  The United States calls

5     Trooper Bethany Craig.

6          **ROOM CLERK:**  Please raise your right hand.

7          *(BETHANY CRAIG, GOVERNMENT'S WITNESS, WAS SWORN)*

8          **ROOM CLERK:**  Thank you.  You may be seated.

9          Please state your name and please spell your name for

10    the record.

11         **THE WITNESS:**  Trooper Bethany Craig, B-E-T-H-A-N-Y,

12    Craig is C-R-A-I-G.

13                        **DIRECT EXAMINATION**

14    BY MR. MC MILLAN:

15    Q.  How are you employed, Trooper Craig?

16    A.  I am employed with the Michigan State Police, Caro post.

17    Q.  Okay.  In what capacity?

18    A.  I am a state trooper.

19    Q.  And do part of your duties include the enforcement of state

20    drug laws?

21    A.  Yes, it does.

22    Q.  As well as theft of property?

23    A.  Yes, it does.

24    Q.  Okay.  And directing your attention to October 19th of

25    2016, were you on duty that day?

CRAIG - DIRECT/MC MILLAN

1    A.  Yes, I was.

2    Q.  And directing your attention to approximately 11 o'clock

3    that morning, were you called to go and respond to a report of

4    criminal activity of some sort?

5    A.  Yes.  A little bit earlier than that, it would have been

6    about 10:20.  Eleven o'clock was when I pulled my complaint

7    number.

8    Q.  Okay.  And did you go someplace?

9    A.  Yes, I did.  I went -- I was dispatched to 6540 Washington

10   Road, which was in Sanilac Township, Sanilac County, in

11   Michigan.

12           **THE COURT REPORTER:**  I'm sorry.  You have to slow

13   down.

14           **THE WITNESS:**  Oh, I'm sorry.

15   A.  6540 Washington Road, Sanilac Township, S-A-N-I-L-A-C, and

16   that's Sanilac County as well.

17   Q.  Okay.  And was that in relation to a report of theft of

18   power?

19   A.  Yes, it was.

20   Q.  What happened next?

21   A.  I was dispatched for a larceny of electricity.  I responded

22   to the scene and met with the Thumb Electric Cooperative

23   employee who was there.  When I got there, I met with him, and

24   also there was another subject on scene who identified himself

25   as David Lurry, Jr.

CRAIG - DIRECT/MC MILLAN

1    Q.   And that's L-U-R-R-Y?

2    A.   Yes.

3    Q.   And that electrical cooperative that you talked about, so

4    we can help the court reporter out, how do you spell that?

5    A.   It's Thumb Electric Cooperative.

6    Q.   Like T-H-U-M-B?

7    A.   Yes, the thumb, T-H-U-M-B.

8    Q.   Okay.  And you indicated that you met with a Mr. Lurry?

9    A.   Yes.

10   Q.   And can you explain what happened with him briefly?

11   A.   Mr. Lurry tried to hand me a phone and tell me that the

12   homeowner was on the phone.  I told him I wasn't gonna talk to

13   either one of them at that time until I had a chance to talk to

14   the TEC employee -- "TEC" is short for Thumb Electric

15   Cooperative -- until I spoke to the employee and found out what

16   exactly was going on, on scene.

17   Q.   Okay.  And did you determine if there was a massive amount

18   of electricity being used at the house that caused you to

19   suspect a marijuana grow inside the --

20   A.   Yes, there was.  There was a lot of electricity.

21   Q.   Okay.  As a result of that were you asked by

22   Mr. Lundy (sic) to go and speak to someone?

23   A.   Mr. Lurry asked me to speak to the homeowner.

24   Q.   Lurry.

25   A.   I tried asking him questions, and he immediately dialed the

CRAIG - DIRECT/MC MILLAN

1    phone and told me that it was the homeowner on the phone, who

2    was his father-in-law, he said.

3    Q.   Okay.  And do you know what the name of that person was?

4    A.   He told me his name was Johnny Benjamin.

5    Q.   Okay.  And to cut to the chase so that the Court knows

6    we're talking about the same person, did you later see the

7    person that you spoke to on the phone someplace in court?

8    A.   Yes, I did, in Sanilac County court.

9    Q.   Okay.  And do you see that same person in court here today?

10   A.   Yes, I do.

11   Q.   Can you point to him and describe what he's wearing,

12   please?

13   A.   He's wearing blue at the defense table.

14          **MR. MC MILLAN:**  Your Honor, may the record reflect the

15   witness has identified the defendant, Johnny Benjamin?

16          **THE COURT:**  The record will so reflect.

17   BY MR. MC MILLAN:

18   Q.   So, you were having a phone conversation with this person

19   who identified himself as Johnny Benjamin.  Did you ask him in

20   the course of your conversations to provide you with his date

21   of birth, his Social Security number, and other identifying

22   information?

23   A.   I asked him his first, middle, last name, date of birth,

24   and an address, which I later determined was actually a work

25   address.

CRAIG - DIRECT/MC MILLAN

1    Q.   Okay.  And did you record all those things in your report?

2    A.   Yes, sir, I did.

3    Q.   Did that later result in charges being brought against

4    Defendant Benjamin?

5    A.   Yes, it did.

6    Q.   And is that a -- is that why you had the opportunity to go

7    and see this person in court yourself?

8    A.   Yes, I did.  I believe it was for a prelim. hearing that

9    we -- actually was not held, but I did see him.

10   Q.   Now, if I can take you back to October 19th of 2016, based

11   on your observations, did you believe that there was a

12   growhouse inside the residence?

13   A.   Yes, I did.  Due to the electricity, I believed it was

14   either a marijuana grow or possibly a meth lab.

15   Q.   Okay.  And what did you do to try to get inside the house?

16   A.   I asked for consent to search the house first.

17   Q.   From whom?

18   A.   From Mr. Benjamin.

19   Q.   Okay.  That was on the telephone?

20   A.   That was on the telephone, yes.

21   Q.   And what was Defendant Benjamin's response to your request?

22   A.   He denied me consent to search his home.

23   Q.   Okay.  As a result of that, what did you do?

24   A.   I obtained a search warrant to search the home.

25   Q.   Okay.  So, when you spoke to Defendant Benjamin on

CRAIG - CROSS/MURRELL

1    October 19th of 2016, he was clearly aware of the fact that he

2    could refuse you the opportunity to search his house.

3    A.  Yes.

4    Q.  Thank you.

5         **MR. MC MILLAN:**  No further questions, your Honor.

6         **THE COURT:**  Cross-examination.

7                      **CROSS-EXAMINATION**

8    BY MR. MURRELL:

9    Q.  Not only was he aware that he could refuse you consent to

10   search, he exercised that right and said, No, you cannot search

11   that house, right?

12   A.  Yes, sir, he did.

13        **MR. MURRELL:**  I don't have any other questions.

14        **THE COURT:**  Redirect?

15        **MR. MC MILLAN:**  No, thank you, your Honor.

16        **THE COURT:**  Thank you, Trooper.  You may step down.

17   You're excused.

18        **THE WITNESS:**  Thank you, sir.

19        *(Witness excused)*

20        **THE COURT:**  The government may call its next witness.

21        **MR. MC MILLAN:**  Thank you.

22        The United States calls Special Agent Buemi to the

23   stand.

24        **ROOM CLERK:**  Please raise your right hand.

25        *(MICHAEL BUEMI, GOVERNMENT'S WITNESS, WAS SWORN)*

BUEMI - DIRECT/MC MILLAN

```
 1              ROOM CLERK:  Thank you.  You may be seated.
 2              Please state your name and please spell your name for
 3    the record.
 4              THE WITNESS:  Special Agent Michael Buemi, B-U-E-M-I.
 5                         DIRECT EXAMINATION
 6    BY MR. MC MILLAN:
 7    Q.  And how are you employed, Special Agent Buemi?
 8    A.  I'm employed with the Drug Enforcement Administration.
 9    Q.  Okay.  And are you one of the case agents on the Benjamin
10    investigation?
11    A.  Yes, sir.
12    Q.  And directing your attention to October 6th of 2017, were
13    you working as a DEA special agent at that time?
14    A.  Yes, sir.
15    Q.  And -- on the Benjamin investigation?
16    A.  Yes, sir.
17    Q.  Now, prior to that date, can you explain to the Court what
18    evidence that you had that the defendant would be transporting
19    illegal drugs to the city of Philadelphia?
20    A.  Previous to that day, we had an informant provide
21    Dr. Benjamin with counterfeit oxycodone pills, explain to him
22    that it was acetylfentanyl, and according to the CS, his
23    intentions were to fly them to a distributor.
24    Q.  Okay.  And for the record, the controlled substance that
25    you're talking about is acetylfentanyl, is that correct?
```

BUEMI - DIRECT/MC MILLAN

1    A.  Yes, sir.

2    Q.  Okay.  And the CS that you were referring to is a

3    cooperating source?

4    A.  Yes, sir.

5    Q.  And was that transaction with Defendant Benjamin both audio

6    and video recorded?

7    A.  Yes, sir.

8    Q.  In addition to that transaction, had you extensively

9    debriefed this source of information?

10   A.  Yes, sir.

11   Q.  At the point in time that this transaction took place, were

12   you of the opinion that this informant could be deemed past

13   reliable?

14   A.  Yes, sir.

15   Q.  With respect to the information that you were provided, did

16   the informant tell you that Benjamin had taken drugs someplace

17   in the past?

18   A.  Yes, he did.

19   Q.  What did he tell you?

20   A.  He told me that he has previously just taken drugs on the

21   plane on his carry-on.

22   Q.  And with respect to those drugs on the previous occasions,

23   what type of drugs are we talking about -- marijuana, opiates,

24   what?

25   A.  Pills.

BUEMI - DIRECT/MC MILLAN

1    Q.   Okay.  Well, what kind of pills?

2    A.   Opiates.

3    Q.   Okay.  And did the informant know where Benjamin would be

4    carrying the pills on this occasion?

5    A.   Say again, sir?

6    Q.   Did the informant tell you where Dr. Benjamin would be

7    carrying the pills on this occasion, on his trip to

8    Philadelphia, based on his past experience?

9    A.   Yes, he did.

10   Q.   Where did he tell you he would have them, meaning Benjamin

11   have them?

12   A.   He was gonna have them -- bring them to Philadelphia.

13   Q.   In what?

14   A.   Oh, in a bag.

15   Q.   In a bag?  Whose bag?

16   A.   I mean, in his own carry-on luggage, Dr. Benjamin's own

17   luggage.

18   Q.   Okay.  And --

19   A.   We didn't necessarily know what bags it would be.  It was

20   just Dr. Benjamin would -- had previously brought pills on a

21   plane.  We didn't realize what kind of baggage it would be.

22   Q.   Okay.  Did you have any identification as to what luggage

23   Benjamin would be taking with him on this trip to Philadelphia?

24   A.   No.  We have no description of the bag or any bags.  We

25   would not know what he would actually be putting these pills

BUEMI - DIRECT/MC MILLAN

1   into.

2   Q.  Did you seek legal counsel in an attempt to go and get a

3   search warrant?

4   A.  Yes, sir.

5   Q.  And what was your understanding of whether you could get

6   one or not?

7   A.  We couldn't get one at the time, just because we didn't

8   know, uhm, what he would be using to bring the pills onto the

9   plane.

10  Q.  Now, did you have an original plan in terms of trying to go

11  and follow the drugs to Philadelphia?

12  A.  Yes, sir.

13  Q.  Can you describe to the Court what your plan was there?

14  A.  Our plan was to conduct surveillance on Dr. Benjamin.

15  Originally we would have allowed him to go on the plane or at

16  least explored the idea to have the pills walk through the TSA.

17  On -- we contacted the DEA in Philadelphia.  They advised that

18  they couldn't resource that or support that idea.  Also, it

19  could have been a possibility that he could have destroyed the

20  evidence possibly on the plane if we kind of hinked *(sic)* him

21  up or anything like that during the investigation.

22  Q.  So, was it your intention on October -- I'm sorry --

23  October 6th of 2017 that those pills should ever leave the

24  airport?

25  A.  Our intention was never to allow those pills to leave the

BUEMI - DIRECT/MC MILLAN

1    airport.

2    Q.  Did you ask someone to assist you in getting those pills --

3    A.  Yes, we did.

4    Q.  -- through legal means?

5    A.  Yes -- yes, we did.

6    Q.  Okay.  And who did you ask to do that?

7    A.  Officer Naughton.

8    Q.  Is that Sergeant Naughton?

9    A.  Sergeant Naughton.

10   Q.  Okay.  And what did you ask him to do?

11   A.  We advised him that -- that a Dr. Benjamin -- and gave him

12   a description -- would be attempting -- or at least we believed

13   he would be attempting to try to bring pills onto a plane, and

14   to conduct -- or at least speak to him and -- with the attempt

15   to do a consent to search.

16   Q.  What was your intention if Sergeant Naughton was

17   unsuccessful in that regard?

18   A.  Our intention would to at that time -- well, we advised him

19   to notify us if that was unable -- if he was unable to do that,

20   and then we would go and grab a search warrant for that bag.

21   Q.  Did you already have the equivalent of an affidavit of

22   probable cause ready should that come to pass?

23   A.  Yes, sir.

24   Q.  Okay.  And had you researched whether you could go state or

25   federal in terms of getting a search warrant in the Middle

BUEMI - CROSS/MURRELL

1  District of Florida if the defendant refused?

2  A.  Yes, sir.

3       **MR. MC MILLAN:**  No further questions, your Honor.

4       **THE COURT:**  Cross-examination.

5                    **CROSS-EXAMINATION**

6  BY MR. MURRELL:

7  Q.  When did you attempt to get the search warrant that you're

8  describing?

9  A.  Previous to the search, I called my AUSA, advised him that

10  we believed he'd be taking the pills onto a plane, and we -- I

11  was advised -- again, what I said previous -- he -- we spoke

12  before, that, uhm, we didn't know what type of bag or anything

13  like that would be being brought on there, so we could not grab

14  a search warrant.

15  Q.  Your AUSA told you that he did not believe you had probable

16  cause.

17  A.  No, that's not what I said.

18  Q.  Well, then why could you not get a search warrant?

19  A.  Because we don't know what he's bringing the pills onto the

20  plane with.

21  Q.  Isn't that part of knowing enough to get a warrant?

22  A.  You can't -- I don't understand your question, sir.

23  Q.  All right.  Let me see if I can be more clear.

24  A.  Okay.

25  Q.  The assistant United States attorney that you spoke to

BUEMI - CROSS/MURRELL

1    said, You can't get a warrant based on what you know now.

2    A.   I advised my AUSA the information that I had.  And at that

3    time, the information I had, I could not grab a search warrant,

4    because I don't know what the bags or anything he's using to

5    bring the pills onto the plane.  We have to conduct

6    surveillance to further the investigation.

7              And, again, I'm protecting at this time a CS during

8    the investigation.

9    Q.   Well, let's --

10   A.   It's not my intent to compromise the investigation.

11   Q.   You did not want Dr. Benjamin to become aware of the fact

12   that he was under investigation, is that fair?

13   A.   That's fair.

14   Q.   Okay.  Because you were not in a position yet to be able to

15   make an arrest.

16   A.   I don't understand what you're saying.

17   Q.   Because your case was not in a position at that time to

18   make an arrest on Dr. Benjamin.

19   A.   We didn't intend on arresting him just yet, that's correct.

20   Q.   Okay.  The DEA 6 that I have dealing with this incident

21   says that surveillance had information Benjamin would be

22   travelling to the Orlando and Melbourne International Airport.

23   A.   That's correct.

24   Q.   That's before he even left Vero Beach, right?

25   A.   That's correct.

BUEMI - CROSS/MURRELL

1    Q.  How did you know that?

2    A.  I received information from an airline that he would be

3    flying the next -- on that day.

4    Q.  And when -- how far in advance of these events was that

5    information obtained?

6    A.  Uhm, I don't recall.  It's -- I don't recall the exact

7    time.

8    Q.  Well, just give us a ballpark.  Was it a matter of days?

9    A.  Previous day.

10   Q.  Okay.  So, at least one day in advance, you knew he was

11   going to the airport.

12   A.  At least.

13   Q.  All right.  And you have talked about this informant that

14   was working with you.  He was actually, in essence, a

15   coconspirator, right?

16   A.  Do I answer that question about an informant?

17        **MR. MURRELL:**  Well, Judge, we know who he is.  He --

18   A.  Am I supposed to disclose an informant --

19   Q.  I'm not asking for his name.

20   A.  Okay.  I --

21   Q.  I'm asking for the fact that you believe, and you had

22   evidence of the fact that -- you have alleged -- that he was

23   working as coconspirator with Dr. Benjamin.

24   A.  Previous to us approaching that cooperator, yes.

25   Q.  Well, that's how you made him become a cooperator.  You

BUEMI - CROSS/MURRELL

1    confronted him with the evidence against him and said, You work

2    with us, and we might be able to mitigate some of the damage

3    for you, right?

4    A.   We asked if he would cooperate with us.

5    Q.   Right.

6         And he was doing that to try to lessen any potential

7    sentence he might have in the future, right?

8    A.   I've -- that is his intentions, I'm sure.

9    Q.   Okay.

10   A.   Okay.

11   Q.   You had never worked with him prior to him agreeing to work

12   for you under these circumstances, right?

13   A.   That's correct.

14   Q.   You knew nothing about his veracity or credibility or

15   anything else.

16   A.   Excuse me.  When -- what time frame are we talking about?

17   Q.   Between the time that you confronted him with the evidence

18   that you believe made him a coconspirator here and the time of

19   this incident at the airport.  It was several months, right?

20   A.   That I was aware of the CS?

21   Q.   What -- approximately what day did you confront this

22   confidential source?

23   A.   I don't recall the exact date.

24   Q.   I'm just asking for a ballpark.

25   A.   I can't even give you a ballpark right now.  Are we -- I

45

BUEMI - CROSS/MURRELL

```
 1   don't understand why we're -- is this about the search or is
 2   this about the -- our cooperator?
 3           THE COURT:  Agent, if there's an objection, I'll rule
 4   on the objection.
 5           THE WITNESS:  Okay, sir.
 6           THE COURT:  Unless there's an objection, answer the
 7   questions.
 8           THE WITNESS:  Okay.
 9   A.  Let me think.  I would believe the summer of last year.
10   Q.  Okay.  So, say August?  Does that sound about right?
11   A.  That I'm aware of this person or when we approached him?
12   Q.  When you approached him.
13   A.  Uhm, sometime in the summer.  I can't exact (sic) know
14   which month at this point.
15   Q.  All right.  Just so that I'm not confused, you are the lead
16   agent on this case, right?
17   A.  That's correct.
18   Q.  All right.  But you don't remember when you first
19   confronted this codefendant.
20   A.  I'll give you a ballpark.  In the summer of last year.
21   Q.  All right.  And the incident at the airport happened in
22   October.
23   A.  That's correct.
24   Q.  All right.  So, during the intervening months, you were
25   working with this codefendant, right?
```

BUEMI - CROSS/MURRELL

1   A.   That's correct.

2   Q.   And would it be fair -- I mean I think we can all agree he

3   was basically working to work off charges, right?

4   A.   That's correct.

5   Q.   Okay.  Do you agree with me or not that people who are

6   working off charges have an extra motive to possibly lie or

7   misstate evidence?

8   A.   I will agree that it's possible.

9   Q.   Okay.

10  A.   That's correct.

11  Q.   All right.  And when you're applying for a warrant, you

12  want to be clear to a judge about the status of the source of

13  your information, right?

14  A.   That's correct.

15  Q.   All right.  So, when you talk about this person being a

16  past reliable source, you're talking about the few months

17  between when you confronted him and the October date that

18  you're confronting my client in the airport.

19  A.   That's correct.

20  Q.   All right.  And what you had at that point was a series of

21  debriefings from him, right?

22  A.   Yes.

23  Q.   And you were attempting at that point to verify some of the

24  things that he had told you in those debriefings.

25  A.   Uhm, yeah.

BUEMI - CROSS/MURRELL

1    Q.   Okay.  And the other things you had done is you had him

2    record meetings between himself and my client.

3    A.   That's correct.

4    Q.   All right.  So, the only thing that you really knew that

5    you could say was reliable were those recordings that you had

6    heard yourself.

7    A.   Uhm, I wouldn't exactly say the only things that were

8    reliable are the recordings.  Uhm, the CS hasn't said or did

9    anything for me not to believe what he was saying was not true.

10   Q.   Well, when you called him past reliable, and then you tell

11   the Court that he told you that Johnny Benjamin had carried

12   drugs to Philadelphia many times in the past, how many times

13   was that?

14   A.   I can't recall how many times, sir.

15   Q.   Was it more than once?

16   A.   He recall -- as I recall, sir, is that he has previously

17   done it.

18   Q.   So, we don't know whether that's previously as in one time

19   or previously in a dozen times.

20   A.   Correct.  We don't have a number.

21   Q.   And at the date of this incident in the airport in

22   Melbourne, you had no airline records indicating that Johnny

23   Benjamin had been flying to Philadelphia on a regular basis,

24   did you?

25   A.   Uhm, I'm not -- I can't say that's true, because I know we

BUEMI - CROSS/MURRELL

```
 1   had information from the Michigan case that he has previously
 2   flown many times, and I also had information from the airlines
 3   that he would be flying to Philadelphia.
 4   Q.  I'm not asking about his flights to Michigan.
 5   A.  No, no, I'm not saying the flights to Michigan.
 6   Q.  I'm asking --
 7   A.  They did a record request on his flights, and previously he
 8   was known to fly many times.
 9   Q.  Well, known to fly many times is very different than known
10   to fly to Philadelphia on a consistent, regular basis.
11   A.  Okay.
12   Q.  I'm talking about flights to Philadelphia where your
13   informant said he was delivering drugs.
14   A.  To --
15   Q.  What evidence -- let me just make --
16   A.  Okay.
17   Q.  What evidence did you have to confirm that claim by your
18   informant on the date that this incident in the airport
19   happened?
20   A.  The airlines notified us he was flying to Philadelphia.
21   Q.  I'm --
22   A.  Okay.
23   Q.  I'm talking about what evidence did you have that confirmed
24   any information your informant gave you about prior trips to
25   Philadelphia.
```

BUEMI - CROSS/MURRELL

1   A.   Oh.  I don't recall.  I don't recall that information.

2   Q.   As we sit here today, you don't know of any that you had

3   that day, isn't that fair?

4   A.   Yeah, that's fair.  The CS said he had previously flown on

5   the airplane with drugs as a carry-on.  That's the information

6   I had.

7   Q.   As a carry-on.

8   A.   Yes.

9   Q.   Okay.  So, you clearly had no way to confirm that

10  information.

11  A.   That's -- that's correct, yeah.

12  Q.   All right.  Did you check -- when you found out that

13  Mr. Benjamin was flying that day, did you check to see if he

14  had any checked luggage?

15  A.   At what point?

16  Q.   Well, at the point when you found out he had made

17  reservations or at the point when you found out he had appeared

18  at the airport.

19  A.   No.

20  Q.   Okay.  When -- you said you had -- you said on direct you

21  had begun drafting a search warrant?

22  A.   I had previously probable cause throughout the

23  investigation that's already been previously drafted that I

24  would apply on to a search warrant, that's correct.

25  Q.   I want to -- please explain to me what you mean there.  Did

BUEMI - CROSS/MURRELL

1   you have a search -- did you have an application for a search
2   warrant drafted?
3   A.  No.  I -- you mean written, typed out?
4   Q.  Yes, sir.
5   A.  No, sir.
6   Q.  What you're -- then when you say, I had PC, you meant you
7   had gathered enough facts that you thought established probable
8   cause.
9   A.  Probable cause in the investigation, but not enough to
10  search his bags.
11  Q.  Okay.  But at no point prior to this confrontation or
12  search at the airport in Melbourne, no one, you or anyone else
13  on your team, had sat down and composed an application for a
14  search warrant.
15  A.  That's correct.
16  Q.  No one had started putting all of these pieces of evidence
17  into an application to submit to a judge to seize these bags,
18  had they?
19  A.  As the case agent, I was aware of the probable cause -- the
20  probable cause that I had that I could draft a search warrant.
21  However, I didn't have the probable cause to identify what he
22  would be carrying onto the airplane or into the bag itself.  He
23  could be carrying anything.
24  Q.  And at the point in time when he was approached by the
25  Melbourne police, and they obtained these items from his

BUEMI - CROSS/MURRELL

1    luggage, no one at the DEA was in the process of drafting a

2    search warrant, were they?

3    A.   That's correct.

4         **MR. MURRELL:**  I don't have any other questions, Judge.

5         **THE COURT:**  Redirect?

6         **MR. MURRELL:**  Oh, Judge, I'm sorry, could I just have

7    a second.  I --

8         **THE COURT:**  Okay.

9         *(Pause)*

10   BY MR. MURRELL:

11   Q.   Your instructions to Sergeant Naughton, were they to detain

12   Mr. Benjamin if he would not consent to the search?

13   A.   Oh, no.

14   Q.   They were to let him go on through the concourse and get on

15   the plane.

16   A.   My instructions to Naughton was to -- first of all, I made

17   sure he understood the description of the person and that he

18   could be possibly bringing drugs onto the plane.  My

19   instructions to him were to receive consent to search the bag.

20   Q.   Well, I --

21   A.   And if he was unable to get the consent, to notify me.

22   Q.   And what was the plan there?

23   A.   Once he's notified me, we would secure the bag and then go

24   grab a search warrant.

25   Q.   "We," being the DEA.

BUEMI - REDIRECT/MC MILLAN

1  A.  That's correct.

2  Q.  You were going to make yourself known to Mr. Benjamin.

3  A.  Yeah, we would have to compromise our investigation at that

4  time.

5          **MR. MURRELL:**  I don't have any other questions, Judge.

6          **THE COURT:**  Redirect?

7          **MR. MC MILLAN:**  May I, your Honor?

8          **THE COURT:**  Okay.

9                  **REDIRECT EXAMINATION**

10  BY MR. MC MILLAN:

11  Q.  Were you concerned about there being anything other than

12  your counterfeit pills in that bag?

13  A.  Yes, sir.

14  Q.  Why?

15  A.  Previous to the search of the bag, Dr. Benjamin is known to

16  bring drugs, whether it was oxycodone, and had previously

17  distributed what we believed was fentanyl pills, counterfeit

18  pills.

19  Q.  So, why did that concern you that the bags not leave the

20  airport?

21  A.  For one, fentanyl is a very dangerous drug, and there could

22  be a possibility that it could be commingled with real drugs.

23  And, also, we didn't -- this was DEA evidence we do like to

24  secure.

25  Q.  Now, had you applied for search warrants in other cases

1  yourself, both for places and electronic search warrants?

2  A.  That's correct.

3  Q.  On dozens of prior occasions?

4  A.  Yes, sir.

5  Q.  And are you aware that you have to describe the place to be

6  searched with specificity?

7  A.  Yes, sir.

8  Q.  At the time that you went to the airport on October 6th of

9  2017, did you believe that you could honestly describe the

10  place to be searched with specificity?

11  A.  I couldn't describe it at all, no, sir.

12  Q.  Could you write a search warrant for any bags carried by

13  Dr. Benjamin?

14  A.  Not -- not that I believe.

15  Q.  Okay.  Now, with respect to the probable cause that the

16  defendant would be carrying drugs, did you review an audio and

17  videotape between the confidential source and

18  Defendant Benjamin that was taken the day before?

19  A.  That's correct.

20  Q.  And who said that the drugs were going to Philadelphia?

21  A.  Dr. Benjamin.

22  Q.  And was the fact that Dr. Benjamin took drugs to

23  Philadelphia corroborated by your confidential source?

24  A.  That's correct.

25  Q.  So, when defense counsel asked you earlier about whether

54

1   you had corroboration of the confidential source, did not

2   Dr. Benjamin provide that confirmation?

3   A.  That's correct.

4   Q.  Do you recall the questions you were asked about whether

5   people working off charges have tendency to go and lie and make

6   things up?

7   A.  Yes, sir.

8   Q.  Well, during the entirety of the time that you have been

9   working with the person that we've referenced as "CS2," or

10  "cooperating defendant 2," have you received numerous items of

11  factual information from that person?

12  A.  Yes.

13  Q.  And to the extent that you've been able to, have you

14  attempted to corroborate them?

15  A.  Yes.

16  Q.  And have they ever proven to be wrong?

17  A.  No.

18          **MR. MC MILLAN:**  No further questions, your Honor.

19          **THE COURT:**  Thank you, Agent.  You may step down.

20  You're excused.

21          **THE WITNESS:**  Thank you, sir.

22          *(Witness excused)*

23          **THE COURT:**  The government may call its next witness.

24          **MR. MC MILLAN:**  Your Honor, that would conclude our

25  presentation of evidence.

```
1              THE COURT:  Mr. Murrell, any witnesses?

2              MR. MURRELL:  No, sir.

3              THE COURT:  Any objection to my having a colloquy with

4     your client regarding his right to testify?

5              MR. MURRELL:  Judge, I don't object.  I haven't talked

6     to him about that.

7              THE COURT:  Well, why don't you talk to him first.

8              MR. MURRELL:  All right.

9              (Discussion had off the record between counsel and

10    client)

11             MR. MURRELL:  Okay, Judge.

12             THE COURT:  Mr. Benjamin, do you understand you have a

13    constitutional right to testify?

14             THE DEFENDANT:  Yes, sir, I understand.

15             THE COURT:  You have a constitutional right not to

16    testify.

17             Do you understand that?

18             THE DEFENDANT:  Yes, sir, I understand.

19             THE COURT:  Your lawyer's been to law school, he's

20    tried a lot of cases, he gives you the benefit of his legal

21    advice, but it's your life, you don't have to follow the

22    advice.

23             Do you understand that?

24             THE DEFENDANT:  Yes, sir, I understand.

25             THE COURT:  And there may be strategy reasons for or
```

 1    against your testifying.

 2              Do you understand that?

 3         **THE DEFENDANT:**  Yes, sir.

 4         **THE COURT:**  And whatever decision you make in this

 5    case, you're pretty much going to be stuck with that decision.

 6              Do you understand that?

 7         **THE DEFENDANT:**  Yes, sir.

 8         **THE COURT:**  For example, if you decide to testify, and

 9    if you turn out to be a lousy witness, and I deny the motion to

10    suppress, you can't complain about that later on, because you

11    decided to testify.

12              Do you understand that?

13         **THE DEFENDANT:**  Yes, sir.

14         **THE COURT:**  On the other hand, if you decide not to

15    testify, and if I deny the motion to suppress, you can't come

16    back later on and say, Oh, Judge, if you would have just heard

17    my testimony, you would have granted the motion to suppress.

18              Do you understand that?

19         **THE DEFENDANT:**  Yes, sir, I do.

20         **THE COURT:**  And have you had enough time to think

21    about this and talk about it with your lawyer?

22         **THE DEFENDANT:**  Yes, sir.

23         **THE COURT:**  And is it your decision that you do or do

24    not want to testify?

25         **THE DEFENDANT:**  Do not want to testify.

1              **THE COURT:**  Argument, Mr. Murrell.

2         **MR. MURRELL:**  I'm sorry, Judge?

3              **THE COURT:**  Argument on your motion to suppress.

4         **MR. MURRELL:**  Judge, this -- the government takes the

5    tact that this was a consensual search, and it just doesn't

6    fly.  And mostly I would point to Government's Exhibits 4 and

7    5.  The case law says that the TSA searches are administrative

8    searches for the purpose of protecting the travelling public.

9    They are looking for threats to air safety -- weapons,

10   prohibited items, things like that.  And they are, therefore,

11   warrantless, suspicionless.  They are generalized searches that

12   everybody is familiar with and that anybody that wants to fly

13   has to submit to.

14        The Eleventh Circuit case law is clear that you cannot

15   put your luggage on that belt, and then if the search turns

16   south on you say, Oh, never mind, I want to leave.  You are in

17   it until they arrest you if they find contraband in your

18   luggage.  There's no question about that.  But it's an

19   administrative search designed to be only as intrusive as

20   necessary to detect the prohibited items on an airplane.

21        Mr. Benjamin cleared that search.  That search was

22   over, as the Melbourne police officers candidly admitted.  But

23   what they did, very subtly, was piggyback on that

24   administrative search to institute a criminal search for

25   criminal evidence.

1    **THE COURT:**  Do you have any case law saying that the

2    administrative search at an airport is limited just to what TSA

3    is doing?

4    **MR. MURRELL:**  Well, Judge, I think I cited those in my

5    motion, but -- and let's be clear.  I'm not saying that if TSA

6    turns up evidence of a crime, they have to turn a blind eye to

7    it or ignore it.  I mean drug cases are made every day when

8    people try to walk through the TSA search and are found to be

9    carrying --

10    **THE COURT:**  I mean, the airport search case law

11    existed before TSA even existed, right?

12    **MR. MURRELL:**  Yes, sir.  Yes, sir.

13    **THE COURT:**  Probably existed before there were metal

14    detectors in every airport.

15    **MR. MURRELL:**  I'll grant you that, yes, sir.

16    **THE COURT:**  So, I'm having a tough time understanding

17    why the case law that says once you present yourself to get on

18    a plane at an airport, it's implied that you're consenting to

19    have your luggage searched -- I'm having a tough time

20    understanding how that implied consent only applies to the TSA

21    search and not any law enforcement search.

22    **MR. MURRELL:**  Because that's why the courts have

23    justified the administrative nature of this search, this

24    warrantless, suspicionless, not individualized probable cause.

25    They said, As long as you limit it, we're gonna allow it.  It's

1    a balancing act between the security needs of the flying public

2    and our Fourth Amendment rights.  And they have struck that

3    balance by saying, You're looking for evidence of danger to the

4    flying public, but we're not going to allow you to corrupt this

5    administrative search for general criminal law enforcement

6    purposes.

7         **THE COURT:**  So, if someone's on a plane, and they're

8    acting very suspicious and, you know, maybe causing concern to

9    the flight attendants before they take off, and the flight

10   attendants call the local police to come in and investigate,

11   they wouldn't have the right to pat them down or search them

12   any different than if they had encountered them on the sidewalk

13   walking down the street.  That it would be the same law that

14   would apply on a plane applicable to police officers as if they

15   bumped into a citizen on the street.

16        **MR. MURRELL:**  I think it would depend on the

17   information the flight attendants provide to law enforcement.

18   I mean, if he's nervous and he's sweating, but he's sitting in

19   his seat, he might just be somebody that's afraid of flying.

20   If he is up running up and down the aisles and creating

21   commotion and interfering with the flight service, then he's

22   committing a crime.  And of course law enforcement can do

23   whatever they need to do.  But that gets back to exactly my

24   point.  It's individualized suspicion based on articulable

25   reasons.  And that's far different from an administrative

1   search of everyone.

2          The other thing I would point to is that the essence

3   of a consent search is the ability to say no.  And that's not

4   what these signs tell anybody.  And that's exactly why the

5   Melbourne police walked up there while his baggage was still on

6   the belt and mentioned bullets and TSA getting all worked up.

7   They wanted him to believe that this was simply an extension of

8   that administrative search, which you cannot say no to if you

9   intend to fly.  And they never advised him otherwise.

10          **THE COURT:**  Anything further?

11          **MR. MURRELL:**  No, sir.

12          **THE COURT:**  Mr. McMillan?

13          **MR. MC MILLAN:**  Your Honor, I apologize, because I

14   only found this case this morning.  And I have a copy for your

15   Honor.  But it's *United States vs. McKennon*, M-c-K-E-N-N-O-N,

16   and it's found at 814 F.2d 1539, and specifically at page 1544.

17          May a present a copy to the Court?

18          **THE COURT:**  Okay.

19          **MR. MC MILLAN:**  Up until this point, your Honor -- and

20   when I had -- the Court received a copy of our supplemental

21   memorandum?

22          **THE COURT:**  I did.

23          **MR. MC MILLAN:**  Okay.  Up until that point, I thought

24   it was a good and made sense argument that the critical nature

25   of drug trafficking in our nation also made drugs a thing of

1  concern to the regulatory scheme of airport searches, but it

2  wasn't until I found this case under Note 5 on page 1544, which

3  I've taken the liberty of highlighting, that the Eleventh

4  Circuit itself indicated that "it is beyond question that the

5  government has a compelling interest in intercepting drug

6  couriers and preventing air piracy."  And, of course, air

7  piracy is the justification for looking for guns and bombs.

8          So, clearly, the Eleventh Circuit fully anticipated

9  and understood the fact that drugs were fully part of the

10 equation when they came up with the critical zone doctrine.

11         And as your Honor has already pointed out, the case

12 law in this circuit is very, very clear that any search that

13 occurs within that zone of inspection at the airport -- going

14 back into the '70s and '80s, it was actually at the gate, and

15 as the Court is aware, it has moved back to the beginning of

16 the terminal now, and, of course, after events in France, it

17 may move further out yet, but at present, the defendant was

18 clearly within the secure -- the security inspection zone of

19 the airport.

20         Now, Sergeant Naughton's job is to go and conduct

21 criminal investigations of items in that secure zone of the

22 airport.  As he testified, the TSA personnel themselves have no

23 arrest authority.  In fact, when they find something, they call

24 him in.  And as the Court also accurately stated, this doctrine

25 well pre-exists the transportation administration's existence

```
 1   and goes back to the days when those inspections are being
 2   conducted by ordinary civilians, much as, quite frankly, they
 3   are now.  The TSA employees are not sworn law enforcement
 4   officers; they are inspectors and nothing more.
 5        Under the circumstances, then, your Honor, we believe
 6   that it is unequivocal that the officer, that is,
 7   Sergeant Naughton, was well within his rights under the
 8   constitution in conducting an inspection of the defendant's
 9   luggage, particularly since he not only had the minimal mere
10   suspicion but outright probable cause that there would be drugs
11   contained in the defendant's luggage.
12        Now, we have presented this other evidence to your
13   Honor, because if the Court for some reason were to find that
14   the search had gone beyond that, that it then becomes, under
15   our theory, a consent search, and if neither A nor B, that
16   inevitable discovery also would potentially apply, because the
17   only reason, your Honor, that we didn't get a search warrant to
18   begin with was because we didn't know what kind of luggage the
19   defendant would be bringing with him and where it would be.
20   And we knew that positively as of the time that
21   Sergeant Naughton approached the defendant.  If he had refused,
22   the officers stated that they would have let him proceed.  DEA
23   said they would have stopped the defendant, exposed themselves
24   then, and gotten a search warrant.  None of that was necessary,
25   however, your Honor, because the search took place lawfully and
```

1  constitutionally at a zone which the Eleventh Circuit has

2  unequivocally stated is a perfectly permissible zone for the

3  search of baggage submitted by the defendant when he made the

4  voluntary decision to go through that airport check-in line.

5      Unless your Honor has any questions, that would

6  conclude our presentation.

7      **THE COURT:**  Anything further, Mr. Murrell?

8      **MR. MURRELL:**  Well, I'd like to respond to this case

9  that was just handed to me.  And I would point out first that

10  that was a search incident to an arrest; it was not a consent

11  search.  And based on that, I'm not sure how the language that

12  the government relies on at Headnote 5 is anything but dicta.

13      And I would also say that this case is not an

14  administrative TSA search.  It is a DEA agent doing drug

15  interdiction at Atlanta Hartsfield Airport and developing

16  probable cause for an arrest, which then led to a search, a far

17  different course than we have here.  And I would submit that

18  this case is not something that should sway the Court one way

19  or the other.

20      **THE COURT:**  All right.  I appreciate everybody coming

21  in.  I'll try to get an order out as soon as I can.

22      **MR. MURRELL:**  Thank you, Judge.

23      **MR. MC MILLAN:**  Thank you, your Honor.

24      **ROOM CLERK:**  All rise.

25      **MR. MC MILLAN:**  Your Honor, does the Court have copies

1    of all the exhibits?

2          **THE COURT:**  Yeah, I think Karen's got all the

3    exhibits, and you'll need to make copies for the clerk.

4          **MR. MC MILLAN:**  Does your Honor wish a copy of the

5    video disk?

6          **THE COURT:**  I mean, the transcript covered the video

7    disk or not?

8          **MR. MC MILLAN:**  The video disk shows more things than

9    the transcript covers, your Honor.

10         **THE COURT:**  All right.  So give it to me.  I'll look

11   at it before I rule.

12         **MR. MC MILLAN:**  Yes, your Honor.

13         **THE COURT:**  And we'll be in recess.

14         **ROOM CLERK:**  All rise.

15         *(The Judge exited the courtroom)*

16         *(Proceedings concluded at 2:31 p.m.)*

17                        -  -  -  -  -

18

19

20

21

22

23

24

25

1                    **INDEX OF WITNESSES**

2     **GOVERNMENT'S WITNESS**                    **PAGE**

3     **Patrick Naughton**
      Direct by Mr. McMillan                       4
4     Cross by Mr. Murrell                         14
      Redirect by Mr. McMillan                     20
5
      **Austin Moyer**
6     Direct by Mr. McMillan                       22
      Cross by Mr. Murrell                         25
7
      **Bethany Craig**
8     Direct by Mr. McMillan                       30
      Cross by Mr. Murrell                         35
9
      **Michael Buemi**
10    Direct by Mr. McMillan                       36
      Cross by Mr. Murrell                         41
11    Redirect by Mr. McMillan                     52

12                    - - - - -

13                    **INDEX OF EXHIBITS**

14    **GOVERNMENT'S EXHIBITS:**           **MARKED**        **RECEIVED**

15    4 and 5                                7                 7
      6                                     11                11
16    1                                     11                12

17                    - - - - -

18

19               C E R T I F I C A T E

20     I certify that the foregoing is a correct transcript from

21     the record of proceedings in the above-entitled matter.

22

23
        /S/Francine C. Salopek              _____3-1-18_____
24     Francine C. Salopek, RMR-CRR          Date
       Official Court Reporter
25

**'**

**'70s** [1]  61/14
**'80s** [1]  61/14

**/**

**/S/Francine** [1]  65/23

**1**

**10:20** [1]  31/6
**11** [3]  65/15 65/15 65/16
**11 o'clock** [1]  31/2
**12** [1]  65/16
**1245** [1]  2/10
**14** [1]  65/4
**15 feet** [2]  9/5 10/7
**15 minutes** [2]  25/14 26/5
**1539** [1]  60/16
**1544** [2]  60/16 61/2
**17-80203-CR-WPD** [1]  1/4
**18** [1]  65/23
**19th** [3]  30/24 34/10 35/1
**1:15** [2]  1/8 3/1

**2**

**20** [1]  65/4
**201** [1]  2/6
**2016** [3]  30/25 34/10 35/1
**2017** [8]  4/24 9/24 12/3 23/1 23/5 36/12
 39/23 53/9
**2018** [2]  1/7 3/1
**203** [1]  2/13
**20th** [1]  2/10
**22** [1]  65/6
**25** [1]  65/6
**299** [1]  2/13
**2:31** [1]  64/16

**3**

**3-1-18** [1]  65/23
**30** [1]  65/8
**32960-3557** [1]  2/10
**33301** [1]  2/13
**33401** [1]  2/7
**33414** [1]  2/4
**35** [1]  65/8
**3557** [1]  2/10
**36** [1]  65/10

**4**

**400** [1]  2/6
**41** [1]  65/10

**5**

**500** [1]  2/4
**52** [1]  65/11
**5657** [1]  2/14

**6**

**6540** [1]  31/15
**6540 Washington** [1]  31/9
**6th** [8]  4/24 9/24 12/2 23/1 23/5 36/12
 39/23 53/8

**7**

**769-5657** [1]  2/14

**8**

**814 F.2d 1539** [1]  60/16

**9**

**954** [1]  2/14

**A**

**A-U-S-T-I-N** [1]  22/20
**ability** [1]  60/3
**above** [1]  65/21
**above-entitled** [1]  65/21
**according** [1]  36/22
**accurate** [1]  12/1
**accurately** [2]  7/10 61/24
**acetylfentanyl** [2]  36/22 36/25
**acknowledged** [1]  28/7
**act** [1]  59/1
**acting** [1]  59/8
**activate** [1]  10/3
**activated** [1]  10/13
**activity** [2]  20/22 31/4
**addition** [2]  14/12 37/8
**address** [2]  33/24 33/25
**Administration** [2]  3/10 36/8
**administration's** [1]  61/25
**administrative** [9]  57/7 57/19 57/24
 58/2 58/23 59/5 59/25 60/8 63/14
**admission** [2]  7/14 12/13
**admitted** [4]  7/17 11/16 12/19 57/22
**advance** [2]  43/4 43/10
**advice** [2]  55/21 55/22
**advised** [7]  39/17 40/11 40/18 41/9
 41/11 42/2 60/9
**affidavit** [1]  40/21
**afraid** [1]  59/19
**afternoon** [1]  3/7
**agency** [2]  5/2 5/5
**agent** [13]  5/7 5/10 5/12 14/14 35/22
 36/4 36/7 36/13 45/3 45/16 50/19 54/19
 63/14
**Agent Buemi** [4]  5/12 14/14 35/22 36/7
**agents** [1]  36/9
**agree** [4]  20/2 46/2 46/5 46/8
**air** [3]  57/9 61/6 61/6
**airline** [2]  43/2 47/22
**airlines** [2]  48/2 48/20
**airplane** [6]  16/12 17/10 17/22 49/5
 50/22 57/20
**airport** [39]
**aisles** [1]  59/20
**alarms** [1]  17/17
**alert** [1]  20/6
**alerted** [1]  15/24
**alleged** [1]  43/22
**allow** [3]  39/25 58/25 59/4
**allowed** [1]  39/15
**although** [1]  9/8
**Amendment** [1]  59/2
**AMERICA** [1]  1/6
**ammunition** [1]  13/12
**amount** [1]  32/17
**Andrew** [1]  2/9
**Andy** [1]  3/13
**announce** [1]  3/5
**answer** [2]  43/16 45/6
**anticipated** [1]  61/8
**apologize** [1]  60/13
**appearance** [1]  25/9
**appearances** [2]  2/1 3/5
**applicable** [1]  59/14
**application** [3]  50/1 50/13 50/17

**applied** [1]  52/25
**applies** [1]  58/20
**apply** [3]  49/24 59/14 62/16
**applying** [1]  46/11
**appreciate** [1]  63/20
**approach** [5]  6/15 6/23 8/2 11/5 15/23
**approached** [11]  5/2 5/5 8/20 10/2
 18/14 22/1 24/8 45/11 45/12 50/24
 62/21
**approaching** [2]  21/10 43/24
**approximately** [6]  6/3 9/5 9/14 14/23
 31/2 44/21
**area** [20]
**argument** [3]  57/1 57/3 60/24
**arm's** [2]  27/16 27/18
**arrest** [7]  20/19 42/15 42/18 57/17
 61/23 63/10 63/16
**arresting** [1]  42/19
**arrived** [4]  15/25 26/3 26/8 27/25
**articulable** [1]  57/25
**assist** [6]  5/19 23/5 23/11 23/12 24/20
 40/2
**assistance** [1]  16/24
**assistant** [2]  2/3 41/25
**assistants** [1]  15/11
**assisted** [1]  23/9
**assisting** [1]  4/21
**Atlanta** [1]  63/15
**attempt** [3]  39/2 40/14 41/7
**attempted** [1]  54/14
**attempting** [3]  40/12 40/13 46/23
**attendants** [3]  59/9 59/10 59/17
**attorney** [2]  3/13 41/25
**Attorney's** [1]  2/3
**Attorneys** [1]  2/3
**audio** [3]  10/10 37/5 53/16
**August** [1]  45/10
**AUSA** [3]  41/9 41/15 42/2
**Austin** [5]  5/22 22/12 22/15 22/19 65/5
**Australian** [1]  2/4
**authority** [2]  20/19 61/23
**Avenue** [1]  2/4
**aware** [9]  26/3 35/1 35/9 42/11 44/20
 45/11 50/19 53/5 61/15

**B**

**B-E-T-H-A-N-Y** [1]  30/11
**B-U-E-M-I** [2]  3/10 36/4
**bag** [27]
**baggage** [4]  19/23 38/21 60/5 63/3
**bags** [32]
**balance** [1]  59/3
**balancing** [1]  59/1
**ballpark** [4]  43/8 44/24 44/25 45/20
**basis** [2]  47/23 48/10
**Beach** [5]  2/4 2/7 2/10 3/13 42/24
**bear** [1]  12/8
**becomes** [1]  62/14
**begin** [1]  62/18
**beginning** [1]  61/15
**begun** [1]  49/21
**belief** [1]  18/22
**believe** [14]
**believed** [4]  34/13 40/12 41/10 52/17
**belong** [1]  28/6
**belonged** [1]  24/13
**belongings** [1]  27/8
**belt** [5]  17/12 26/21 26/23 57/15 60/6
**benefit** [1]  55/20

**B**

**BENJAMIN [75]**
**Benjamin's [6]** 10/9 15/12 24/17 25/9 34/21 38/16
**Bethany [4]** 30/5 30/7 30/11 65/7
**beyond [2]** 61/4 62/14
**birth [2]** 33/21 33/23
**black [2]** 26/17 26/18
**blind [1]** 58/6
**blinking [3]** 10/8 10/22 10/23
**blue [2]** 6/7 33/13
**Blvd [1]** 2/13
**body [5]** 8/11 8/12 8/13 9/3 21/22
**boiled [1]** 25/22
**bombs [1]** 61/7
**briefed [1]** 25/10
**Broward [1]** 2/13
**Buemi [9]** 3/9 5/10 5/12 14/14 35/22 35/25 36/4 36/7 65/9
**bullet [1]** 13/16
**bullets [8]** 19/17 28/13 28/20 28/23 28/25 29/4 29/7 60/6
**bumped [1]** 59/15

**C**

**C-R-A-I-G [1]** 30/12
**call [9]** 3/19 17/1 17/3 17/25 30/3 35/20 54/23 59/10 61/23
**called [3]** 31/3 41/9 47/10
**calling [1]** 21/18
**calls [4]** 3/21 22/12 30/4 35/22
**calm [1]** 24/18
**camera [3]** 9/25 10/13 27/5
**candidly [1]** 57/22
**capacity [1]** 30/17
**captured [1]** 10/10
**card [1]** 9/12
**Caro [1]** 30/16
**carried [2]** 47/11 53/12
**carry [4]** 37/21 38/16 49/5 49/7
**carry-on [4]** 37/21 38/16 49/5 49/7
**carrying [8]** 8/5 8/6 38/4 38/7 50/22 50/23 53/16 58/9
**cause [12]** 40/22 41/16 49/22 50/8 50/9 50/19 50/20 50/21 53/15 58/24 62/10 63/16
**caused [1]** 32/18
**causing [1]** 59/8
**Center [1]** 2/6
**certify [1]** 65/20
**chance [1]** 32/13
**charges [4]** 34/3 46/3 46/6 54/5
**chase [1]** 33/5
**check [5]** 28/21 28/23 49/12 49/13 63/4
**check-in [1]** 63/4
**checked [1]** 49/14
**checking [4]** 23/12 27/5 29/6 29/8
**checkpoint [20]**
**checkpoint's [1]** 10/19
**circuit [5]** 57/14 61/4 61/8 61/12 63/1
**circumstances [2]** 44/12 62/5
**cited [1]** 58/4
**citizen [1]** 59/15
**city [2]** 22/24 36/19
**civilians [1]** 62/2
**claim [1]** 48/17
**clear [5]** 41/23 46/12 57/14 58/5 61/12
**cleared [3]** 17/19 21/22 57/21

**clerk [1]** 64/3
**client [4]** 46/18 47/2 55/4 55/10
**CLYDE [2]** 1/9 3/4
**co [1]** 3/9
**co-counsel [1]** 3/9
**coconspirator [3]** 43/15 43/23 44/18
**codefendant [2]** 45/19 45/25
**collect [1]** 27/8
**colloquy [1]** 55/3
**commingled [1]** 52/22
**committing [1]** 59/22
**commotion [1]** 59/21
**compelling [1]** 61/5
**complain [1]** 56/10
**complaint [1]** 31/6
**completed [1]** 22/5
**completion [1]** 18/13
**composed [1]** 50/13
**compromise [2]** 42/10 52/3
**computer [1]** 1/25
**concern [3]** 52/19 59/8 61/1
**concerned [4]** 29/1 29/3 29/9 52/11
**conclude [2]** 54/24 63/6
**concluded [1]** 64/16
**conclusion [1]** 21/19
**concourse [3]** 22/4 26/25 51/14
**conduct [7]** 15/10 16/22 21/12 39/14 40/14 42/5 61/20
**conducted [6]** 4/22 14/6 16/18 16/21 25/1 62/2
**conducting [2]** 5/14 62/8
**confidential [4]** 44/22 53/17 53/23 54/1
**confirm [1]** 29/6 48/17 49/9
**confirmation [1]** 54/2
**confirmed [1]** 48/23
**confront [1]** 44/21
**confrontation [1]** 50/11
**confronted [4]** 44/1 44/17 45/19 46/17
**confronting [1]** 46/18
**confused [1]** 45/15
**connection [1]** 5/3
**consensual [1]** 57/5
**consent [23]**
**consenting [1]** 58/18
**consistent [1]** 48/10
**constitution [1]** 62/8
**constitutional [2]** 55/13 55/15
**constitutionally [1]** 63/1
**contact [1]** 14/22
**contacted [3]** 14/13 15/2 39/17
**contained [1]** 62/11
**contraband [1]** 57/17
**controlled [1]** 36/24
**conversation [2]** 12/2 33/18
**conversations [2]** 11/19 33/20
**cooperate [1]** 44/4
**cooperating [2]** 37/3 54/10
**cooperative [6]** 13/10 24/18 31/22 32/3 32/5 32/15
**cooperator [3]** 43/24 43/25 45/2
**copies [2]** 63/25 64/3
**copy [5]** 13/1 60/14 60/17 60/20 64/4
**corroborate [1]** 54/14
**corroborated [1]** 53/23
**corroboration [1]** 54/1
**corrupt [1]** 59/4
**counsel [6]** 3/5 3/9 3/23 39/2 53/25 55/9
**counsel's [1]** 3/8

**counterfeit [4]** 5/15 36/21 52/12 52/17
**County [1]** 31/10 31/16 33/8
**couriers [1]** 61/6
**court [22]**
**courtroom [7]** 3/2 5/8 6/4 9/15 9/21 23/18 64/15
**courts [1]** 58/22
**covered [1]** 64/6
**covers [1]** 64/9
**CR [1]** 1/4
**Craig [4]** 30/5 30/7 30/11 30/12 30/15 65/7
**creating [1]** 59/20
**credibility [1]** 44/14
**crime [2]** 58/6 59/22
**criminal [6]** 20/22 31/4 57/24 57/25 59/5 61/21
**critical [2]** 60/24 61/10
**Cross [12]** 14/18 14/20 25/5 25/7 35/6 35/7 41/4 41/5 65/4 65/6 65/8 65/10
**Cross-examination [8]** 14/18 14/20 25/5 25/7 35/6 35/7 41/4 41/5
**CRR [2]** 2/11 65/24
**CS [6]** 36/22 37/2 42/7 44/20 47/8 49/4
**CS2 [1]** 54/9
**cut [1]** 33/5

**D**

**damage [1]** 44/2
**danger [1]** 59/3
**dangerous [1]** 52/21
**date [9]** 23/18 33/20 33/23 36/17 44/23 46/17 47/21 48/18 65/24
**David [1]** 31/25
**DEA [15]**
**DEA 6 [1]** 42/20
**debriefed [1]** 37/9
**debriefings [2]** 46/21 46/24
**decide [2]** 56/8 56/14
**decided [1]** 56/11
**decision [4]** 56/4 56/5 56/23 63/4
**deemed [1]** 37/12
**defendant [24]**
**defendant 2 [1]** 54/10
**Defendant Benjamin [5]** 13/8 14/15 24/24 34/4 53/18
**defendant's [3]** 25/1 62/8 62/11
**defense [2]** 33/13 53/25
**demeanor [2]** 13/8 24/17
**denied [1]** 34/22
**deny [2]** 56/9 56/15
**department [5]** 4/12 5/19 5/24 20/25 22/25
**depend [1]** 59/16
**depict [1]** 7/10
**deputy [2]** 9/15 9/21
**describe [9]** 6/6 13/8 13/9 23/22 33/11 39/13 53/5 53/9 53/11
**describing [1]** 41/8
**description [3]** 38/24 40/12 51/17
**designed [1]** 57/19
**destination [1]** 16/4
**destroyed [1]** 39/19
**detain [1]** 51/11
**detect [1]** 57/20
**detector [2]** 8/10 8/11
**detectors [1]** 58/14
**determine [1]** 32/17
**determined [1]** 33/24

## D

developing [1] 63/15
device [3] 9/3 10/3 17/17
devices [1] 9/23
dialed [1] 32/25
dicta [1] 63/12
Dimitrouleas [1] 1/14
direct [11] 4/8 10/7 17/24 22/21 30/13
 36/5 49/20 65/3 65/6 65/8 65/10
directing [6] 4/24 6/3 23/4 30/24 31/2
 36/12
directly [1] 9/8
disclose [1] 43/18
discovery [1] 62/16
Discussion [1] 55/9
disk [3] 64/5 64/7 64/8
dispatched [2] 31/9 31/21
distributed [1] 52/17
distributor [1] 36/23
DISTRICT [5] 1/1 1/2 1/15 2/12 41/1
DIVISION [1] 1/3
doctrine [2] 61/10 61/24
Donny [1] 3/11
double [2] 28/21 28/23
double-check [2] 28/21 28/23
dozen [1] 47/19
dozens [1] 53/3
Dr. [18]
Dr. Benjamin [16]
Dr. Benjamin's [2] 15/12 38/16
draft [1] 50/20
drafted [2] 49/23 50/2
drafting [2] 49/21 51/1
Drive [1] 2/6
drug [8] 3/10 30/20 36/8 52/21 58/7
 60/25 61/5 63/14
drugs [18]
duties [3] 4/13 4/21 30/19
duty [5] 4/25 5/19 9/25 20/23 30/25

## E

Electric [3] 31/22 32/5 32/14
electrical [1] 32/3
electricity [4] 31/21 32/18 32/20 34/13
electronic [2] 9/23 53/1
Eleven [1] 31/6
Eleven o'clock [1] 31/6
Eleventh [4] 57/14 61/3 61/8 63/1
employed [7] 4/10 22/23 22/24 30/15
 30/16 36/7 36/8
employee [3] 31/23 32/14 32/15
employees [1] 62/3
encounter [3] 6/4 6/12 23/17
encountered [1] 59/12
enforce [1] 20/23
enforcement [10] 3/10 5/2 20/17 30/19
 36/8 58/21 59/5 59/17 59/22 62/3
engage [1] 10/14
engaged [1] 13/14
entirety [1] 54/8
entitled [1] 65/21
entry [1] 7/10
equation [1] 61/10
equipped [1] 9/23
equivalent [1] 40/21
Esq [2] 2/5 2/9
essence [2] 43/14 60/2
essentially [1] 27/11

## established [1] 50/7

established [1] 50/7
events [2] 43/4 61/16
everybody [2] 57/12 63/20
everyone [1] 60/1
evidence [21]
examination [14]
exchange [5] 13/7 13/11 14/15 24/10
 24/23
excuse [2] 9/7 44/16
excused [8] 22/9 22/11 29/25 30/2
 35/17 35/19 54/20 54/22
Executive [1] 2/6
exercised [1] 35/10
Exhibit [8] 7/22 11/10 11/11 11/16
 11/22 11/24 12/14 12/19
Exhibit 1 [2] 11/22 12/14
Exhibit 4 [1] 7/22
Exhibit 6 [1] 11/10
exhibits [11] 7/3 7/4 7/5 7/14 7/17 16/7
 57/6 64/1 64/3 65/13 65/14
Exhibits 4 [4] 7/3 7/14 16/7 57/6
existed [3] 58/11 58/11 58/13
existence [1] 61/25
exists [1] 61/25
exited [2] 8/15 64/15
experience [1] 38/8
explain [9] 15/6 18/25 28/11 29/12
 29/15 32/10 36/17 36/21 49/25
explained [1] 5/14
explanation [1] 15/9
explored [1] 39/16
explosives [1] 17/8
exposed [1] 62/23
extension [1] 60/7
extensively [1] 37/8
extent [1] 54/13
extra [1] 46/6
eye [1] 58/6

## F

F.2d [1] 60/16
face [2] 15/4 15/4
face-to-face [1] 15/4
faces [1] 10/25
facility [1] 4/16
facing [1] 10/25
fact [11] 16/11 17/24 20/7 29/7 35/1
 42/11 43/21 43/22 53/22 61/9 61/23
facts [1] 50/7
factual [1] 54/11
father [1] 33/2
father-in-law [1] 33/2
February [2] 1/7 3/1
federal [1] 40/25
fentanyl [2] 52/17 52/21
FL [1] 2/10
flight [5] 16/3 59/9 59/9 59/17 59/21
flights [4] 48/4 48/5 48/7 48/12
FLORIDA [7] 1/2 1/7 2/4 2/7 2/13 4/12
 41/1
flown [2] 48/2 49/4
fly [7] 36/23 48/8 48/9 48/10 57/6 57/12
 60/9
flying [9] 16/12 43/3 47/23 48/3 48/20
 49/13 59/1 59/4 59/19
foot [1] 26/18
foregoing [1] 65/20
FORT [3] 1/3 1/7 2/13
Fourth [1] 59/2

## frame [1] 44/16

frame [1] 44/16
France [1] 61/16
Francine [3] 2/11 65/23 65/24
frankly [1] 62/2
FRIDAY [1] 3/1
friendly [2] 13/9 13/10
front [3] 9/13 9/20 27/13

## G

gaining [1] 15/11
Garcia [2] 2/2 3/9
gate [1] 61/14
gathered [1] 50/17
general [2] 22/4 59/5
generalized [1] 57/11
gentleman [2] 6/5 23/21
gets [1] 59/23
gives [1] 55/20
gonna [5] 14/11 19/12 32/12 38/12
 58/25
gotten [1] 62/24
government [9] 2/2 3/17 3/19 30/3
 35/20 54/23 57/4 61/5 63/12
GOVERNMENT'S [20]
grab [4] 40/20 41/13 42/3 51/24
grant [1] 58/15
granted [2] 19/13 56/17
Green [1] 2/9
grow [2] 32/19 34/14
growhouse [1] 34/12
guns [1] 61/7

## H

hand [6] 4/1 22/14 30/6 32/11 35/24
 56/14
handed [1] 63/9
handwritten [1] 12/5
Hartsfield [1] 63/15
he'd [2] 5/17 41/10
heading [1] 26/24
Headnote [1] 63/12
Headnote 5 [1] 63/12
hear [2] 14/14 24/10
heard [2] 47/6 56/16
hearing [2] 1/13 34/8
height [2] 26/17 26/18
help [2] 17/25 32/4
heroin [1] 21/6
highlighting [1] 61/3
hinked [1] 39/20
hit [1] 21/11
home [2] 34/22 34/24
homeowner [3] 32/12 32/23 33/1
honestly [1] 53/9
Honor [37]
Honorable [1] 1/14
hostile [1] 13/9
hours [1] 14/24
house [5] 32/18 34/15 34/16 35/2
 35/11
hypodermic [1] 21/6
hypothetical [1] 21/7

## I

I'd [3] 7/2 7/13 63/8
I'll [5] 45/3 45/20 58/15 63/21 64/10
I'm [34]
I've [2] 25/19 44/8 61/3
idea [2] 39/16 39/18

## I

identification [7]  7/3 7/6 11/9 11/11 11/22 11/24 38/22
identified [4]  6/9 31/24 33/15 33/19
identify [1]  50/21
identifying [1]  33/21
ignore [1]  58/7
illegal [1]  36/19
immediate [1]  10/19
immediately [1]  14/13 18/13 32/25
implied [3]  59/14 58/18 58/20
imply [2]  19/22 20/2
incident [7]  14/24 42/20 44/19 45/21 47/21 48/18 63/10
include [2]  4/21 30/19
INDEX [2]  65/1 65/13
indicate [1]  12/5
indicated [2]  32/8 61/4
indicating [4]  5/9 6/5 23/21 47/22
indicator [1]  10/20
individualized [2]  58/24 59/24
inevitable [1]  62/16
inform [2]  18/16 18/19
informant [11]  36/20 37/12 37/16 38/3 38/6 43/13 43/16 43/18 48/13 48/18 48/24
information [18]
informed [1]  15/25
initial [1]  24/23
initialed [1]  11/25
initials [1]  12/8
initiate [1]  19/1
inspection [11]  20/23 21/12 21/16 21/25 22/3 24/20 24/24 25/2 61/13 61/18 62/8
inspections [2]  14/6 62/1
inspectors [1]  62/4
institute [1]  57/24
instructions [3]  51/11 51/16 51/19
intend [2]  42/19 60/9
intent [1]  42/10
intention [4]  39/22 39/25 40/16 40/18
intentions [2]  36/23 44/8
interaction [2]  20/1 29/11
intercepting [1]  61/5
interdiction [1]  63/15
interest [1]  61/5
interfering [1]  59/21
International [3]  4/11 4/14 42/22
intervening [1]  45/24
intrusive [1]  57/19
investigate [1]  59/10
investigation [12]  5/15 15/7 36/10 36/15 39/21 42/6 42/8 42/10 42/12 49/23 50/9 52/3
investigations [1]  61/21
issue [1]  17/21
item [2]  11/10 11/23
items [6]  13/15 50/25 54/10 57/10 57/20 61/21

## J

job [1]  61/20
jobs [1]  17/6
John [2]  2/2 3/7
JOHNNY [13]  1/9 3/4 6/9 6/12 10/2 10/9 11/19 12/2 33/4 33/15 33/19 47/11 47/22

JR [3]  1/9 2/5 31/25
judge [23]
judge's [2]  9/15 9/21
jumpsuit [1]  6/7
justification [1]  61/7
justified [1]  58/23

## K

Karen's [1]  64/2
keep [1]  9/25
knowing [1]  41/21
knows [1]  33/5

## L

L-U-R-R-Y [1]  32/1
lab [1]  34/14
language [1]  63/11
larceny [1]  31/21
Larry [1]  2/5
LAUDERDALE [3]  1/3 1/7 2/13
law [18]
lawfully [1]  62/25
laws [1]  30/20
lawyer [1]  56/21
lawyer's [1]  55/19
lead [1]  45/15
learn [1]  25/12
learned [1]  25/14
leave [5]  22/3 39/23 39/25 52/19 57/16
led [1]  63/16
legal [4]  21/18 39/2 40/4 55/20
lessen [1]  44/6
letting [1]  8/8
liberty [1]  61/3
life [2]  16/12 55/21
lifting [1]  18/10
light [2]  10/22 10/23
limit [1]  58/25
limited [1]  58/2
lines [2]  28/20 28/25
list [1]  3/24
local [1]  59/10
location [1]  4/22
lousy [1]  56/9
luggage [14]
Lundy [1]  32/22
Lurry [4]  32/8 32/11 32/23 32/24
Lurry, [1]  31/25
Lurry, Jr [1]  31/25

## M

M-c-K-E-N-N-O-N [1]  60/15
M-O-Y-E-R [1]  22/20
machine [4]  8/15 17/13 18/8 21/23
machines [1]  8/10
male [2]  26/17 26/18
man [1]  15/24
mandatory [3]  16/9 18/23 19/1
manner [1]  23/7
marijuana [3]  32/19 34/14 37/23
marked [7]  7/3 7/5 11/9 11/11 11/21 11/24 65/14
massive [1]  32/17
matter [2]  43/8 65/21
MC [2]  6/11 22/22
McKennon [1]  60/15
McMillan [9]  2/2 3/8 60/12 65/3 65/4 65/6 65/8 65/10 65/11
mean [9]  15/13 38/16 46/2 49/25 50/3

58/7 58/10 59/18 64/6
meaning [1]  38/10
means [1]  40/4
meant [1]  50/6
mechanical [1]  1/24
meet [4]  23/14 26/4 26/9 26/14
meetings [1]  47/2
Melbourne [14]
memorandum [1]  60/21
mere [1]  62/9
metal [3]  8/9 8/11 58/13
Metcalf [3]  2/9 2/9 3/13
meth [1]  34/14
Michael [5]  3/9 5/10 35/25 36/4 65/9
Michigan [5]  30/16 31/11 48/1 48/4 48/5
middle [2]  33/23 40/25
MILLAN [2]  6/11 22/22
minded [1]  19/15
minimal [1]  62/9
minutes [2]  25/14 26/5
misstate [1]  46/7
mitigate [1]  44/2
modern [1]  16/12
month [1]  45/14
months [4]  23/3 44/19 45/24 46/16
morning [4]  3/11 14/23 31/3 60/14
mostly [1]  57/6
motion [7]  1/13 3/14 56/9 56/15 56/17 57/3 58/5
motive [1]  46/6
move [3]  7/13 12/13 61/17
moved [5]  9/5 10/6 10/18 11/3 61/15
Moyer [6]  5/22 22/13 22/15 22/19 22/23 65/5
MR [13]  6/11 22/22 41/6 65/3 65/4 65/4 65/6 65/6 65/8 65/8 65/10 65/10 65/11
Mr. [41]
Mr. Benjamin [31]
Mr. Benjamin's [1]  25/9
Mr. Lundy [1]  32/22
Mr. Lurry [3]  32/8 32/11 32/23
Mr. McMillan [1]  60/12
Mr. Murrell [3]  55/1 57/1 63/7
Mr. Naughton [1]  29/12
Murrell [10]  2/5 3/12 41/6 55/1 57/1 63/7 65/4 65/6 65/8 65/10

## N

N-A-U-G-H-T-O-N [1]  4/7
name [15]
nation [1]  60/25
nature [2]  58/23 60/24
Naughton [28]
Naughton's [1]  61/20
necessary [2]  57/20 62/24
needle [1]  21/6
neither [1]  62/15
nervous [2]  13/10 59/18
nine [1]  14/23
nobody [1]  17/13
None [1]  62/24
Nope [1]  17/18
normally [1]  17/5
Note [1]  61/2
Note 5 [1]  61/2
noticed [1]  28/21
notified [2]  48/20 51/23
notify [2]  40/19 51/21

**N**

number [3]  31/7 33/21 47/20
numerous [1]  54/10

**O**

o'clock [2]  31/2 31/6
object [2]  21/7 55/5
objection [6]  7/15 12/17 45/3 45/4 45/6
55/3
observable [1]  10/24
observations [1]  34/11
obtain [1]  14/3
obtained [4]  13/13 34/24 43/5 50/25
occasion [2]  38/4 38/7
occasions [2]  37/22 53/3
October [14]
October 19th [3]  30/24 34/10 35/1
October 6th [8]  4/24 9/24 12/2 23/1
23/5 36/12 39/23 53/8
Office [1]  2/3
officer [12]  4/13 5/18 5/21 5/22 5/23
22/12 22/23 23/6 27/4 29/24 40/7 62/6
Officer Austin [2]  5/22 22/12
officers [5]  20/17 57/22 59/14 62/4
62/22
Official [2]  2/12 65/24
Oh [10]  13/1 18/2 26/9 31/14 38/14
49/1 51/6 51/13 56/16 57/16
one p.m [2]  6/3 23/4
operating [1]  18/22
opiates [2]  37/23 38/2
opinion [1]  37/12
opportunity [4]  10/16 11/1 34/6 35/2
opposed [2]  15/13 15/15
order [1]  63/21
ordinary [1]  62/2
original [1]  39/10
originally [2]  10/2 39/15
Orlando [1]  42/22
outright [1]  62/10
Overrule [1]  21/8
oxycodone [2]  36/21 52/16

**P**

P.A [1]  2/9
p.m [5]  1/8 3/1 6/3 23/4 64/16
package [1]  16/25
packages [1]  17/14
page [4]  12/6 60/16 61/2 65/2
page 1544 [2]  60/16 61/2
page 2 [1]  12/6
Palm [2]  2/4 2/7
part [4]  4/20 30/19 41/21 61/9
participate [2]  17/3 20/3
pass [2]  27/12 40/22
passed [2]  9/4 27/14
passengers [1]  17/7
pat [1]  59/11
Patrick [4]  3/22 4/2 4/6 65/3
Pause [1]  51/9
PC [1]  50/6
pen [3]  9/25 10/20 10/25
people [5]  13/16 13/23 46/5 54/5 58/8
perfectly [1]  63/2
permissible [1]  63/2
permission [2]  19/10 19/12
person [13]  23/9 23/20 33/3 33/6 33/7
33/9 33/18 34/7 45/11 46/15 51/17 54/9

54/11
person's [1]  24/4
personal [1]  9/25
personnel [4]  16/18 20/16 20/19 61/22
Philadelphia [15]
phone [6]  32/11 32/12 33/1 33/1 33/7
33/18
photographs [2]  6/21 7/8
pick [1]  8/25
picked [1]  8/25
pictures [1]  16/6
pieces [1]  50/16
piggyback [1]  57/23
pills [21]
piracy [2]  61/6 61/7
place [5]  9/24 37/11 53/5 53/10 62/25
Plaintiff [1]  1/7
plan [4]  39/10 39/13 39/14 51/22
plane [15]
play [2]  11/14 12/24
playing [1]  13/2 13/5
point [23]
pointed [1]  61/11
police [11]  4/12 5/19 20/25 22/25 23/6
30/16 50/25 57/22 59/10 59/14 60/5
portion [1]  25/2
position [2]  42/14 42/17
positively [1]  62/20
possession [1]  21/5
possibility [3]  28/19 39/19 52/22
post [1]  30/16
potential [1]  44/6
potentially [1]  62/16
power [1]  31/18
pre [1]  61/25
pre-exists [1]  61/25
precede [1]  7/10
prelim [1]  34/8
present [5]  3/12 15/2 58/17 60/17
61/17
presentation [2]  54/25 63/6
presented [2]  21/15 62/12
preventing [1]  61/6
private [1]  9/1
probable [12]  40/22 41/15 49/22 50/7
50/9 50/19 50/20 50/21 53/15 58/24
62/10 63/16
proceed [2]  3/16 62/22
proceeded [1]  8/25
proceedings [3]  1/24 64/16 65/21
process [3]  14/2 18/3 51/1
produced [1]  1/25
prohibited [4]  13/15 17/22 57/10 57/20
property [1]  30/22
protect [1]  4/15
protecting [2]  42/7 57/8
proven [1]  54/16
provide [4]  33/20 36/20 54/2 59/17
provided [2]  16/6 37/15
providing [1]  16/2
public [6]  4/15 9/6 9/8 57/8 59/1 59/4
publish [2]  7/18 12/20
pulled [1]  31/6
purposes [1]  59/6

**Q**

question [6]  20/6 21/17 41/22 43/16
57/18 61/4
questions [14]

**R**

raise [4]  4/1 22/14 30/6 35/24
range [1]  13/17
ranking [1]  23/6
ray [4]  8/15 17/13 18/8 21/23
reach [2]  27/17 27/18
reactivated [1]  10/8
read [1]  7/21
ready [2]  3/16 40/22
realize [1]  38/21
reasons [2]  55/25 59/25
recall [11]  15/16 16/5 43/6 43/6 44/23
47/14 47/16 47/16 49/1 49/1 54/4
receive [1]  51/19
received [7]  7/16 11/15 12/18 43/2
54/10 60/20 65/14
recess [1]  64/13
recognize [3]  7/4 11/10 11/22
record [19]
recorded [2]  1/24 37/6
recorder [1]  10/21
recording [3]  10/10 10/17 10/21
recordings [2]  47/5 47/8
records [1]  47/22
Redirect [9]  20/13 20/14 29/22 35/14
51/5 52/6 52/9 65/4 65/11
referenced [1]  54/9
referring [1]  37/2
reflect [5]  6/8 6/10 24/2 33/14 33/16
refuse [4]  18/20 29/19 35/2 35/9
refused [2]  41/1 62/21
regular [2]  47/23 48/10
regulatory [1]  61/1
relation [1]  31/17
relatively [1]  5/23
reliable [5]  37/13 46/16 47/5 47/8 47/10
relies [1]  63/12
remember [2]  18/7 45/18
report [3]  31/3 31/17 34/1
reporter [4]  2/11 2/12 32/4 65/24
request [3]  10/9 34/21 48/7
requested [2]  23/5 23/12
requesting [1]  19/10
required [1]  13/24
researched [1]  40/24
reservations [1]  49/17
residence [1]  34/12
resource [1]  39/18
respond [2]  31/3 63/8
responded [1]  31/21
response [3]  6/2 8/22 34/21
responsibilities [2]  4/20 4/21
result [4]  14/15 32/21 34/3 34/23
results [1]  19/23
retrieve [2]  18/10 27/17
review [2]  11/18 53/16
rights [2]  59/2 62/7
rise [2]  63/24 64/14
RMR [2]  2/11 65/24
RMR-CRR [1]  65/24
Road [2]  31/10 31/15
Rolando [2]  2/2 3/9
rolling [1]  24/13
Room [1]  2/13
rule [2]  45/3 64/11

**S**

S-A-N-I-L-A-C [1]  31/15

**S**

**safe [1]** 14/3
**safety [1]** 57/9
**Salopek [3]** 2/11 65/23 65/24
**Sanilac [5]** 31/10 31/10 31/15 31/16 33/8
**sat [1]** 50/13
**Save [1]** 11/14
**saw [3]** 8/5 19/23 28/13
**scanner [3]** 8/13 9/3 21/22
**scanners [2]** 8/11 8/12
**scanning [1]** 17/17
**scene [3]** 31/22 31/24 32/16
**scheme [1]** 61/1
**school [1]** 55/19
**screen [2]** 8/9 9/2
**screening [11]** 6/13 6/15 6/19 7/11 8/8 10/6 16/9 17/7 17/8 26/21 26/23
**scrubs [2]** 26/17 26/19
**search [97]**
**searched [5]** 13/24 28/11 53/6 53/10 58/19
**searches [9]** 4/21 16/18 16/22 17/4 19/3 57/7 57/8 57/11 61/1
**seat [1]** 59/19
**second [1]** 51/7
**secure [13]** 4/17 7/11 8/2 8/17 20/22 21/10 21/15 21/25 22/3 51/23 52/24 61/18 61/21
**security [5]** 8/17 14/5 33/21 59/1 61/18
**seek [1]** 39/2
**seeking [1]** 15/15
**seize [1]** 50/17
**sense [1]** 60/24
**sentence [1]** 44/7
**sergeant [35]**
**Sergeant Naughton [19]**
**Sergeant Naughton's [1]** 61/20
**Sergeant Patrick [1]** 3/22
**series [1]** 46/20
**serve [1]** 4/15
**service [1]** 59/21
**short [1]** 32/14
**shy [1]** 23/3
**sic [7]** 3/11 11/25 25/15 28/25 32/22 39/20 45/13
**side [5]** 9/1 9/2 9/6 11/3 28/1
**sides [2]** 3/16 10/24
**sidewalk [1]** 59/12
**signal [1]** 15/17
**signs [5]** 6/14 6/17 6/21 7/10 60/4
**simultaneous [2]** 27/21 27/22
**situation [1]** 26/1
**size [2]** 9/12 9/20
**slow [1]** 31/12
**small [4]** 13/14 20/1 20/2 28/18
**Social [1]** 33/21
**someone's [1]** 59/7
**someplace [3]** 31/8 33/7 37/16
**sometime [1]** 45/13
**soon [1]** 63/21
**sound [1]** 45/10
**sounds [1]** 19/10
**source [8]** 37/3 37/9 44/22 46/12 46/16 53/17 53/23 54/1
**south [1]** 57/16
**SOUTHERN [1]** 1/2
**special [8]** 5/7 5/10 5/12 14/14 35/22

36/4 36/7 36/13
**specificity [2]** 53/6 53/10
**spell [5]** 4/4 22/17 30/9 32/4 36/2
**spit [1]** 18/9
**spoke [11]** 15/4 22/1 25/15 26/1 26/4 28/3 32/15 33/7 34/25 41/11 41/25
**spoken [1]** 25/19
**stand [1]** 35/23
**standing [6]** 26/20 27/4 27/5 27/6 27/8 28/1
**state [8]** 4/2 22/17 30/9 30/16 30/18 30/19 36/2 40/24
**stated [3]** 61/24 62/22 63/2
**STATES [13]** 1/1 1/6 1/15 2/3 2/12 3/4 3/8 3/21 22/12 30/4 35/22 41/25 60/15
**States vs [1]** 3/4
**States vs. McKennon [1]** 60/15
**status [1]** 46/12
**stenography [1]** 1/24
**step [5]** 22/8 27/20 29/24 35/16 54/19
**stipulate [2]** 11/13 23/24
**stopped [1]** 62/23
**straight [2]** 10/24 27/14
**strategy [1]** 55/25
**street [3]** 2/10 59/13 59/15
**strictly [1]** 17/6
**struck [1]** 59/2
**stuck [2]** 21/11 56/5
**subject [3]** 6/18 16/8 31/24
**submit [3]** 50/17 57/13 63/17
**submitted [1]** 63/3
**substance [1]** 36/24
**subtly [1]** 57/23
**Suite [1]** 2/6
**summer [3]** 45/9 45/13 45/20
**summon [1]** 16/24
**summons [1]** 16/22
**supplemental [1]** 60/20
**support [1]** 39/18
**suppress [5]** 3/15 56/10 56/15 56/17 57/3
**surveillance [3]** 39/14 42/6 42/21
**suspect [1]** 32/19
**suspicion [2]** 59/24 62/10
**suspicionless [2]** 57/11 58/24
**suspicious [4]** 16/24 17/14 19/6 59/8
**Sustain [1]** 21/20
**sway [1]** 63/18
**sweating [1]** 59/18
**sworn [6]** 4/2 20/16 22/15 30/7 35/25 62/3

**T**

**T-H-U-M-B [2]** 32/6 32/7
**table [12]** 3/9 9/10 9/12 9/12 9/20 9/20 10/15 10/18 13/14 26/23 27/6 33/13
**tact [1]** 57/5
**take [6]** 6/21 7/8 8/25 19/14 34/10 59/9
**taken [5]** 19/13 37/16 37/20 53/18 61/3
**takes [1]** 7/17
**talk [10]** 9/16 13/15 20/1 20/2 28/18 32/12 32/13 46/15 55/7 56/21
**talked [3]** 32/3 43/13 55/5
**talking [7]** 33/6 36/25 37/23 44/16 46/16 48/12 48/23
**team [1]** 50/13
**TEC [2]** 32/14 32/14
**telephone [2]** 34/19 34/20
**tell [13]** 14/11 15/14 16/3 20/8 28/13

29/18 32/11 37/16 37/19 38/6 38/10 47/10 60/4
**telling [1]** 19/25
**tendency [1]** 54/5
**tender [1]** 14/17
**terminal [1]** 61/16
**terms [1]** 24/10 39/10 40/25
**testified [1]** 61/22
**testify [8]** 55/4 55/13 55/16 56/8 56/11 56/15 56/24 56/25
**testifying [1]** 56/1
**testimony [1]** 56/17
**text [1]** 15/22
**thank [19]**
**theft [2]** 30/22 31/17
**theory [1]** 62/15
**think [7]** 21/18 45/9 46/2 56/20 58/4 59/16 64/2
**thought [7]** 10/4 10/13 14/3 28/13 28/22 50/7 60/23
**thousands [1]** 19/3
**threats [1]** 57/9
**thumb [4]** 31/22 32/5 32/7 32/14
**till [1]** 10/14
**time [36]**
**times [8]** 19/4 47/12 47/12 47/14 47/19 48/2 48/8 48/9
**tough [2]** 58/16 58/19
**towards [1]** 27/20
**Township [2]** 31/10 31/15
**trafficking [1]** 60/25
**transaction [3]** 37/5 37/8 37/11
**transcript [7]** 1/13 1/24 11/18 12/15 64/6 64/9 65/20
**transcription [1]** 12/1
**transportation [1]** 61/25
**transporting [1]** 36/18
**travel [2]** 4/15 13/17
**travelling [3]** 5/17 42/22 57/8
**trip [2]** 38/7 38/23
**trips [1]** 48/24
**trooper [5]** 30/5 30/11 30/15 30/18 35/16
**Trooper Bethany [1]** 30/5
**true [2]** 47/9 47/25
**TSA [56]**
**typed [1]** 50/3

**U**

**U.S [1]** 2/3
**uhm [10]** 21/3 24/18 39/8 41/12 43/6 45/13 46/25 47/7 47/8 47/25
**unable [3]** 40/19 40/19 51/21
**understand [16]**
**understanding [4]** 14/8 39/5 58/16 58/20
**understood [2]** 51/17 61/9
**unequivocal [1]** 62/6
**unequivocally [1]** 63/2
**UNITED [13]** 1/1 1/6 1/15 2/3 2/12 3/4 3/8 3/21 22/12 30/4 35/22 41/25 60/15
**Unless [2]** 45/6 63/5
**unobtrusively [1]** 11/2
**unsuccessful [1]** 40/17
**us [9]** 16/6 16/22 25/19 40/19 43/8 43/24 44/2 44/4 48/20

**V**

**veracity [1]** 44/14

**V**

**verify [1]** 46/23
**Vero [3]** 2/10 3/13 42/24
**via [1]** 15/22
**video [7]** 10/10 11/13 18/7 37/6 64/5
 64/6 64/8
**videotape [3]** 13/2 13/5 53/17
**view [3]** 9/6 9/7 9/8
**violation [1]** 16/25
**visual [1]** 10/20
**voluntary [1]** 63/4
**vs. [1]** 60/15

**W**

**wait [1]** 9/16
**waiting [2]** 9/5 14/14
**walk [2]** 39/16 58/8
**walked [4]** 18/9 26/13 27/14 60/5
**walking [2]** 27/19 59/13
**walks [1]** 27/11
**warrant [21]**
**warrantless [2]** 57/11 58/24
**warrants [2]** 52/25 53/1
**Washington [2]** 31/9 31/15
**watched [2]** 15/23 19/3
**weapons [2]** 17/9 57/9
**wearing [6]** 6/6 6/7 16/1 23/22 33/11
 33/13
**West [2]** 2/4 2/7
**William [1]** 1/14
**wish [1]** 64/4
**witness [21]**
**witnesses [2]** 55/1 65/1
**wording [1]** 6/20
**work [4]** 33/24 44/1 44/11 46/3
**worked [4]** 19/19 19/22 44/11 60/6
**working [10]** 11/2 23/2 36/13 43/14
 43/23 45/25 46/3 46/6 54/5 54/9
**WPD [1]** 1/4
**write [1]** 53/12
**written [1]** 50/3
**wrong [2]** 18/8 54/16

**X**

**x-ray [4]** 8/15 17/13 18/8 21/23

**Y**

**young [1]** 5/23

**Z**

**zone [8]** 14/5 21/25 61/10 61/13 61/18
 61/21 63/1 63/2